[L.A. No. 32147. July 31, 1986.]

WALTER BAKER, Plaintiff and Appellant, v.
LOS ANGELES HERALD EXAMINER et al.,
Defendants and Respondents.

COUNSEL

Wanda Grasse and Laurence E. Clark for Plaintiff and Appellant.

Stephen G. Contopulos, Susan S. Grover, Donovan, Leisure, Newton & Irvine, John H. Bauman, Victoria F. Collman, Valerie J. Menager and Musick, Peeler & Garrett for Defendants and Respondents.

Paul Hoffman, Gary Williams, Antonette B. Cordero, Mullen & Stabile and Gary D. Stabile as Amici Curiae on behalf of Defendants and Respondents.

OPINION

BIRD, C. J.—The question before this court is whether the Court of Appeal erred in holding that an alleged defamatory statement in a television program review which began with the phrase, "My impression is," was a statement of fact rather than a statement of opinion.

I.

Defendant, Peter Bunzel, writes a regularly featured editorial column entitled "*Peter Bunzel on Television,*" for defendant Los Angeles Herald Examiner (Herald Examiner). On December 29, 1983, the Herald Examiner published a column by Bunzel entitled, "*Birds and bees bomb in 'Sex Education' tonight.*" (Bunzel, *Birds and bees bomb in "Sex Education" tonight,* L. A. Herald Examiner (Dec. 29, 1983) p. C3, cols. 1-2.)

The column reviewed a television documentary entitled "Sex Education: How Far Should We Go?" Plaintiff Baker was the producer of this documentary.

The column consisted of eight paragraphs.[1] The first four paragraphs did not discuss the documentary, but provided background on the author's

---

[1] The column reads in full:

"*Birds and bees bomb in 'Sex Education' tonight*

"*Channel 9 show pretends at analysis, but descends into hypocritical sleaze*

"*PETER BUNZEL On Television*

"My father was an obstetrician/gynecologist, so my sex-education lecture differed from the Andy Hardy norm. Dr. E. E. Bunzel conducted it with proper formality at his office desk, which was loaded with lavishly illustrated medical books. Though I was all of 11 or 12 at the time, I put on a know-it-all act as, with scientific dispassion, he traced the sperm's headlong route to the ovaries. Afterwards, my father no doubt assumed his little talk had cleared up some of the biological mysteries of sex, and though I wouldn't have admitted it, he was absolutely right. I didn't even mind his old-fashioned dose of the Gentleman's Code—you know, consideration, caressing, caution and cleanliness.

"My own children weren't so fortunate. *Their* father's background as a journalist is a poor substitute for an OB/GYN armed with revealing graphics. All the same, my sons got the drift, perhaps more from one another than from me. Anyway, I'm now a two-time grandfather, and somewhere down the line—sooner than my sons think, in fact—they'll be issuing their own invitations to a birds-and-bees chat.

"Or maybe they won't. More and more parents, apparently, are relinquishing their traditional roles as primary sex tutors. One reason may be heightened timidity—it's a subject that often makes even the strongest adults go limp. Another, of course, is the weakening of the family unit and the consequent temptation for parents to turn over that responsibility to our already overburdened public schools.

"No subject is more controversial than the quality of sex education as now taught there. Some groups, such as the Moral Majority, give it a flunking grade; arguing that such courses promote teen-age promiscuity, they insist the subject should revert to parents and pastors, who can lace it with suitable moral guidelines. Wrong, say their adversaries, who argue that a classroom setting enhances unblushing frankness and ensures biologically accurate discussion—far preferable to poor instruction by parents or to the exchange of abysmal misinformation among kids who profess more experience than they actually possess.

"That's the debatable issue raised by a local documentary, 'Sex Education: How Far Should We Go?' airing tonight from 8 to 9 p.m. on KHJ-Channel 9. This fifth in an occasional series of specials called 'The Changing Family' does little to advance the subject and a lot to exploit it. My impression is that executive producer Walt Baker, who is also vice president in charge of programs for Channel 9, told his writer/producer, Phil Reeder, 'We've got a hot potato here—let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up!'

"This egregious program offers standard interviews with teachers, Moral Majority spokesmen, students, parents, sex therapists and other interested parties, none of whom have anything original to say. The only clergyman consulted is a doctrinaire evangelist whose views are contrasted with those of a Planned Parenthood executive—does it surprise you to learn they're at opposite poles? Along the way we visit a class in sex education at Fairfax High, but stay so briefly that we come away with no clear idea of its benefits or drawbacks.

"Inevitably—after all, this is commercial TV—we're taken on a protracted tour of L.A.'s sexiest hotspots, portrayed here as primary, if misbegotten, purveyors of sex education for our progeny. (An anonymous nude dancer, shot discreetly from the rear while in action, proclaims her personal desire 'to be close to God,' suggesting, presumably, that she's not a totally lost cause.) In addition, we see flashes of erotic photographs and meet a young gay who sullenly claims his sexual rights. We also hear a local TV critic charge that one of the worst exploiters of sex is . . . right!—television.

"I can't dispute that charge, especially after having sat through 'Sex Education: How Far Should We Go?' At best, it makes a predictable, pedantic pretense at analysis; at worst, practicing what it preaches against, it hawks sex like a carnival barker. Dr. Bunzel, I feel confident, would recoil at such hypocritical sleaze."

experience with the subject of sex education. First, Bunzel discussed the sex education he received from his father, an obstetrician/gynecologist. He continued this personal perspective through the second paragraph, in which he briefly discussed his efforts at sex education with his children. He commented that they would soon be "issuing their own invitations to birds-and-bees chat" to his grandchildren.

Bunzel then opined that "[m]ore and more parents, apparently, are re-linquishing their traditional roles as primary sex tutors." One reason for this, he believed, is that the subject is so delicate it "makes even the strongest adults go limp." Other reasons are the weakening of the family unit and parental deference in matters of sex education.

The fourth paragraph discussed the quality of sex education in the schools and the various points of view on that subject. Bunzel noted that while groups such as the Moral Majority give the quality of sex education in the public schools "a flunking grade," others argue that a classroom setting is "far preferable to poor instruction by parents or to the exchange of abysmal misinformation among kids who profess more experience than they actually possess."

It was not until the fifth paragraph that Bunzel introduced the topic of the documentary scheduled to air that night. He first expressed his overall conclusion that the program "does little to advance the subject [of sex education] and a lot to exploit it." He then stated: "My impression is that the executive producer Walt Baker, who is also vice president in charge of programs for Channel 9, told his writer/producer, Phil Reeder, 'We've got a hot potato here—let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up!'" It is this passage which the Court of Appeal found defamatory.

The next two paragraphs chronicled Bunzel's disapproval of the program. He commented that those interviewed on the show had nothing "original to say" and that the documentary presented no "clear idea of [the] benefits or drawbacks" of sex education in the public schools. He further recounted scenes from the show, which purportedly included both "flashes of erotic photographs" and "a protracted tour of L.A.'s sexiest hotspots . . . [where] [a]n anonymous nude dancer [was] shot discreetly from the rear while in action."

The review ended with Bunzel's agreeing with the charge that television is one of the worst exploiters of sex and asserting that his father, the doctor, "would recoil at such hypocritical sleaze."

Based on the passage attributed to him in Bunzel's article, plaintiff filed this action, alleging he had been defamed by the article. Defendants demurred, asserting that (1) the allegedly defamatory statement was a constitutionally protected expression of opinion; (2) since the statement was not libelous per se, plaintiff failed adequately to plead the requisite special damages; and (3) since the statement was subject to the "fair comment" privilege,[2] plaintiff failed adequately to plead the requisite actual malice.

The trial court ruled that the statement at issue constituted nonactionable opinion, sustained the demurrer without leave to amend, and entered a judgment of dismissal.[3] Plaintiff appealed.

The Court of Appeal reversed, finding that the statement went beyond a mere critique and effectively charged plaintiff "with an intentional presentation of pornography, obscenity, and lewdness." Holding that the statement constituted "alleged fact" and was defamatory to plaintiff as a matter of law, the Court of Appeal remanded the cause to the trial court for the sole purpose of a trial on the issue of damages.

This court granted review to ascertain whether the Court of Appeal's summary analysis could withstand scrutiny under settled principles of First Amendment law.

## II.

"Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "The *sine qua non* of recovery for defamation . . . is the existence of a falsehood." (*Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 283 [41 L.Ed.2d 745, 761, 94 S.Ct. 2770].)

The falsehood requirement is grounded in the First Amendment itself. "Under the First Amendment there is no such thing as a false idea. However

---

[2]The fair comment privilege is codified in Civil Code section 47, subdivision 3 which provides that a privileged publication or broadcast is one made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

[3]In its ruling the trial court stated: "The use of the phrase 'My impression is' as the opening words of the alleged offending statement clearly points the way to a holding that the statement was one of opinion. The Court does not rely entirely upon that phrase, however. Looking to the communication taken as a whole one sees that it is a review by the writer of a television program. The language complained about is part of the review. The entire article, not just the complained of portion, is an opinion."

pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340, fn. omitted [41 L.Ed.2d 789, 804-805, 94 S.Ct. 2997]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425].) "In this context courts apply the Constitution by carefully distinguishing between statements of opinion and fact, treating the one as constitutionally protected and imposing on the other civil liability for its abuse." (*Gregory, supra,* 17 Cal.3d at p. 601.)

The crucial question in this case is whether the statement at issue was a statement of fact or a statement of opinion. This is a question of law to be decided by the court. (See generally, *Letter Carriers* v. *Austin, supra,* 418 U.S. 264; *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]; see also *Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 450 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Gregory, supra,* 17 Cal.3d at p. 601.) In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction. (Cf. *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36].) "'That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.'" (*Ibid.*)

The distinction as to what is a statement of fact and what is a statement of opinion is frequently a difficult one. "[W]hat constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory, supra,* 17 Cal.3d at p. 601.)

For these reasons, California courts have developed a "totality of the circumstances" test to determine whether an alleged defamatory statement is one of fact or of opinion. First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. (See, e.g., *Okun* v. *Superior Court, supra,* 29 Cal.3d at p. 450; see also Prosser & Keeton on the Law of Torts (5th ed. 1984) p. 780.) Where the language of the statement is "cautiously phrased in terms of apparency,"[4]

---

[4]Webster's defines "apparency" as meaning "appearance" or "the quality or state of being apparent." (Webster's Third New Internat. Dict. (1971) p. 102.)

the statement is less likely to be reasonably understood as a statement of fact rather than opinion. (See, e.g., *Gregory, supra,* 17 Cal.3d at p. 603.)

Next, the context in which the statement was made must be considered. Since "[a] word is not a crystal, transparent and unchanged, [but] is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used[,]" the facts surrounding the publication must also be carefully considered. (See *Towne* v. *Eisner* (1918) 245 U.S. 418, 425 [62 L.Ed. 372, 376, 38 S.Ct. 158].)

This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. (See *Gregory, supra,* 17 Cal.3d at pp. 602-603.) "'[T]he publication in question must be considered in its entirety; "[i]t may not be divided into segments and each portion treated as a separate unit." [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. [Citations.]'" (*Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 291, fn. 11 [112 Cal.Rptr. 609], citing *Corman* v. *Blanchard* (1962) 211 Cal.App.2d 126, 131-132 [27 Cal.Rptr. 327]; see also *Washington Post Co.* v. *Chaloner* (1919) 250 U.S. 290, 293 [63 L.Ed. 987, 989, 39 S.Ct. 448]; *Hoffman* v. *Washington Post Co.* (D.D.C. 1977) 433 F.Supp. 600, 602, fn. 1; Eldredge, The Law of Defamation (1978) § 9, pp. 44-45.)

### III.

Applying the "totality of the circumstances" test, this court must determine whether the average reader of Bunzel's column could have reasonably understood the alleged defamatory statement to be one of fact. If that were possible, the demurrer was improperly sustained and the Court of Appeal's decision was correct.

The statement begins with the phrase "[m]y impression is . . . ." The dictionary meaning of "impression" is "belief" or "view" or "opinion." (American Heritage Dict. of the English Language (1970) pp. 661 & 921.) When one states a view in terms of an "impression," the listener or reader is on notice that the maker is not vouching for its accuracy. A reasonable

person would understand that a statement of opinion rather than of fact was to follow.

Two very similar cases support this conclusion. In *Gregory v. McDonnell Douglas Corp., supra,* 17 Cal.3d 596, a company bulletin and letter that circulated to union members charged union leaders with sacrificing the best interests of union members in order to seek personal gain. In its charge, the company stated: "'[W]e are seriously concerned with [union officials'] *apparent* eagerness to prevent eligible employees from receiving their approved payments in a timely fashion'"; "'[P]ayment to eligible employees is far more important than the political aspirations and personal ambitions of local union leaders who *apparently* are willing to sacrifice such payment so as to demonstrate "union leadership"'"; and "'It is, indeed, unfortunate that our employees have had to wait so long because of *apparent* self-interests of a few [union] leaders . . . . *Apparently* there were some internal politics within [the union] which certain individuals were using to seek personal gain and political prestige rather than to serve the best interest of the members they were supposed to represent.'" (*Id.,* at p. 599, italics added.)

This court unanimously affirmed the trial court's ruling sustaining a demurrer on the ground that the company statements were nonactionable as statements of opinion. The court held that "[t]he language of [these] statements is cautiously phrased in terms of apparency[]" and that "[t]he charges in question are not of a factual nature nor are they of a type calculated to induce the audience, to whom they are addressed, to conclude or understand that they are factual." (*Id.,* at p. 603.)

In *Carr v. Warden* (1984) 159 Cal.App.3d 1166 [206 Cal.Rptr. 162], former members of a city planning commission brought an action for libel against Donald Warden, the chairperson of a local environmental group. The former members alleged that they were defamed by Warden's statement, reported and published in a local newspaper. In his statement he said, "'*I think* someone is being bought on the Planning Commission, otherwise, how else could you explain a 3-3 vote at one meeting on an issue and then at the very next meeting, a 6-1 vote?'" (*Id.,* at p. 1168, italics added.) The Court of Appeal found that this statement represented the "kind of expression of opinion . . . typically generated in the heat of a political controversy." (*Id.,* at p. 1170.)

Plaintiff acknowledges the holdings in these cases. However, he insists that *Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123 [212 Cal.Rptr. 838] compels the conclusion that a reasonable reader would have interpreted the disputed statement as one of fact rather than opinion. In

*Selleck,* a magazine published statements about actor Tom Selleck's relationships with women. The statements were falsely attributed to Selleck's father. The father brought an action for libel on the ground that the article had portrayed him as having revealed his son's "love secrets."

The front page headline read: "'Tom Selleck's love secrets—By His Father.'" The article appeared in the inside of the magazine together with a photograph of Selleck's father and carried the caption, "'His Father Reveals All.'" The article quoted, both directly and indirectly, statements allegedly made about Selleck by his father. Among these were: "'Tom Selleck may be TV's sexiest leading man but his dad says he's really a shy guy so ill at ease with women that he finds it difficult to sustain a lasting relationship'"; and "'"Tom's relationships with the women in his life are always disappointing because he's just not the person they think he should be," the elder Selleck explains.'" (*Id.,* at p. 1128.)

The Court of Appeal reversed the trial court's sustaining of a demurrer, holding that the statements were libelous per se. The court observed that the article did "not merely express defendant's opinion that plaintiff made statements about his son. Rather, [it] assert[s] as a fact that plaintiff made the statements." (*Id.,* at p. 1133.)

Contrast *Selleck* with the present case. Nowhere is it asserted as a fact that Baker made the disputed statement. Instead, Bunzel explicitly qualified the disputed statement by warning the reader that he was not reporting a fact but only giving his "impression." By employing that term, Bunzel made it clear that he intended only to convey his opinion about what Baker might have said to his writer/producer. Such language was similar in meaning to "It appears to me" and was "cautiously phrased in terms of apparency." (*Gregory, supra,* 17 Cal.3d at p. 603.)

Baker also argues that the average reader would interpret Bunzel's statement as a statement of fact because Bunzel set it off by quotation marks. Essentially, he claims quoted material always purports to be an accurate account, regardless of the literary context.

This argument is without merit. Punctuation marks, like words, have many uses. Writers often use quotation marks, yet no reasonable reader would assume that such punctuation automatically implies the truth of the quoted material.

Bunzel's decision to use quotation marks to make his point was a valid journalistic decision. In similar contexts, it has been well understood that "a critic may resort to caricature or rhetorical license." (*Myers* v. *Boston*

*Magazine Co.* (1980) 380 Mass. 336 [403 N.E.2d 376, 381].)[5] Bunzel's use of a hypothetical conversation emphasized the message he was trying to communicate—that he believed Baker might have told his writer/producer that he should make the documentary more colorful in order to attract viewers.[6]

If the exercise of literary style were always subject to the threat of a defamation action, not only would the content of messages ultimately be altered, but the vigorous and vital public debate essential to the democratic process would be "tempered to polite sparring." (See *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 698 [150 Cal.Rptr. 258, 586 P.2d 572] (dis. opn. of Bird, C. J.).)

The context in which the statement was made must also be examined to determine whether it was one of opinion rather than fact. (*Gregory, supra,* 17 Cal.3d at p. 601; see *Greenbelt, supra,* 398 U.S. at pp. 13-14 [26 L.Ed.2d at pp. 14-15]; *Letter Carriers, supra,* 418 U.S. 264.)

*Greenbelt* illustrates this point. There, a real estate developer brought an action for libel after a newspaper reported that several citizens had charged him with having committed blackmail. The plaintiff was seeking a zoning variance from the city to build high-density housing. At the same time, the city was seeking to acquire other land owned by the plaintiff in order to build a school. These negotiations elicited substantial controversy, and several city council meetings were held in which citizens hotly debated the issue. (*Greenbelt, supra,* 398 U.S. at p. 7 [26 L.Ed.2d at p. 11].)

In the first of two articles on the subject, the newspaper outlined the history of the controversy and explained that the plaintiff would agree on a price for the school lot if the city would approve the rezoning of two other pieces of land he owned. The article reported that "'Councilman David Champion, however, denied that it was "blackmail," explaining that he would rather "refer to it (i.e., the negotiations—Ed.) as a two-way street."'" (*Id.,* at p. 16 [26 L.Ed.2d at p. 16].) The second article recounted the defeat of the plaintiff's proposal, but reported one of his supporters as explaining "'that [plaintiff's] action was not "blackmail" but the legitimate advance of his rights to develop his land.'" (*Id.,* at p. 18 [26 L.Ed.2d at p. 17].)

[5]See also *National Rifle Ass'n.* v. *Dayton Newspapers, Inc.* (S.D.Ohio 1983) 555 F.Supp. 1299, 1309 (editorial writers and commentators frequently "resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction").

[6]For example, Bunzel's review would have been less entertaining if the disputed passage had read: "My impression is that executive producer Walt Baker probably told his writer/producer that since the subject matter of his documentary would be of interest to viewers anyway, the use of sexual innuendos and nudity would surely result in higher ratings."

The court held that under the circumstances, the word "blackmail" was not defamatory because no reader could have understood it as a criminal charge against the plaintiff. "On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." (*Id.*, at p. 14 [26 L.Ed.2d at p. 15].)

A contextual analysis leads to a similar conclusion here. Bunzel's column was a highly critical review of a television documentary. The headings at the beginning of the article—"*Birds and bees bomb in 'Sex Education' tonight,*" "Channel 9 show pretends at analysis, but descends into hypocritical sleaze" and "PETER BUNZEL On Television"—immediately conveyed to the reader that this was an editorial column reviewing television programming and that the author strongly disapproved of the show.

The text of the article was permeated with opinion. The introduction to the subject of the documentary was seasoned with Bunzel's personal experiences on sex education and his beliefs about why "[m]ore and more parents are relinquishing their traditional roles as primary sex tutors." Those statements clearly conveyed the idea that the focus of the column was Bunzel's *opinion* about several aspects of sex education.

The sentence which preceded the passage in question criticized the documentary as a program which "does little to advance the subject [of sex education] and a lot to exploit it." This, too, was clearly a statement of Bunzel's opinion about the program. The disputed passage which followed was merely a colorful illustration of what Bunzel imagined might have gone on behind studio doors in an effort to attract a larger viewing audience.

The final four paragraphs of the review panned the documentary. Bunzel concluded by "feel[ing] confident" that his own father "would recoil at such hypocritical sleaze." Those passages reinforce the view that the disputed passage was one of opinion rather than of fact.

In *Selleck, supra,* 166 Cal.App.3d 1123, the defamatory article gave the clear impression that the author had interviewed Selleck's father and had been given information for public consumption. The court held that the "content of the article, viewed in conjunction with [the] headline and caption, clearly and naturally conveys the impression that plaintiff granted an interview to defendant in which he divulged for public dissemination matters about his son which the son revealed to plaintiff in confidence." (*Id.*, at p. 1132.) Here, in contrast, there was no clear or natural indication that Bunzel had interviewed plaintiff's writer/producer and had actually been told of plaintiff's remarks.

*Selleck* and other cases do, however, raise an additional consideration, i.e., whether Bunzel's statement *implied* the existence of undisclosed defamatory facts. Even if a statement appears in opinion form, if it implies factual assertions, some "courts have held that it should not receive the benefit of First Amendment protection as an opinion." (*Ollman* v. *Evans* (D.C.Cir. 1984, en banc) 750 F.2d 970, 984.)

This principle is reflected in section 566 of the Restatement Second of Torts. It provides: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[7]

The question here is whether Bunzel's statement, clearly couched in opinion language, implied the existence of any undisclosed defamatory facts. *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886] provides some guidance on that issue.

In *Slaughter,* a dentist brought a libel action against an insurance company which had denied his patients' claims for reimbursement. The company informed the patients that Slaughter's work was "'unnecessary,'" that he was "'overcharging,'" and that it intended to report him to the California Dental Association for disciplinary proceedings. (*Id.,* at p. 153.)

Reversing the trial court's dismissal following the sustaining of a demurrer, this court held that while such accusations made by laypersons might constitute "mere opinion," the same could not be said when made by "professional dental plan administrators," whose accusations "carry a ring of authenticity and reasonably might be understood as being based on fact." (*Id.,* at p. 154.)

Bunzel's use of a quotation might have implied that he had talked to plaintiff's writer/producer and been told plaintiff's strategy for attracting

---

[7]Thus, courts have found statements to be nonactionable opinion when the facts supporting the opinion are *disclosed*. For example, the statement in *Carr, supra,* 159 Cal.App.3d 1166 that Warden thought the planning commission had been "bought" was deemed nonactionable opinion in part because Warden *disclosed* the facts on which his opinion was based—i.e., that the change in vote was too dramatic to point to any other conclusion. (*Id.,* at p. 1170.)

Similarly, a letter to the editor in *Okun, supra,* 29 Cal.3d 442 in which the author accused the plaintiff of corrupt and collusive activities in connection with a real estate transaction with Beverly Hills officials was held to be nonactionable opinion in part because "[t]he letter's apparent aim . . . was to disclose whatever pertinent facts were known to the writer." (*Id.,* at p. 452.)

However, as *Ollman* correctly holds, disclosure of facts is clearly not a condition precedent to a finding that a statement is nonactionable opinion. (*Ollman, supra,* 750 F.2d at p. 985.)

viewers. However, the statement in Bunzel's article and the statements in *Slaughter* convey significantly different expectations. An insured reasonably expects an insurance company's explanation regarding noncoverage of a claim to be based on facts. It is precisely for this reason that such explanations may be actionable when they turn out to be grounded on speculation.

A reader of a television review, on the other hand, does not reasonably expect every word of the review to be based on facts or even on private conversations with producers, directors, and other industry personnel. Instead, one expects a reviewer's opinions to be based on aesthetic sense and discriminating taste.

This difference in expectations is borne out when the context of the statements here and in *Slaughter* are compared. The insurance company's letter in *Slaughter* purported to explain the company's legal position. It was written in a businesslike style and eschewed literary flair and rhetorical device. (See *Slaughter, supra,* 32 Cal.3d at p. 153.)

Bunzel's statement, in contrast, used flashy hyperbole, such as "hot potato," "titillating innuendo," "bare flesh," "pour it on," and "eat it up." No reasonable reader could conclude from its tone—even if plaintiff had told his writer/producer to "spice up" the program—that plaintiff actually made the statement attributed to him. Clearly, the conversation was "being used in a metaphorical, exaggerated or even fantastic sense" (*Ollman, supra,* 750 F.2d at p. 982) and did not imply the existence of any undisclosed facts.

Moreover, the conversation had a sarcastic air. Indeed, sarcasm was employed throughout the remainder of the article. Viewed in the context of the review, which was a highly acerbic criticism of the documentary, it would be unreasonable to view the conversation as anything more than the hypothetical, tongue-in-cheek invention it was intended to be.

This conclusion is strengthened finally by examining the statement and its meaning in the societal context in which the article was published, the audience it intended to address, and the public debate to which it was meant to contribute. (See *Gregory, supra,* 17 Cal.3d at pp. 601-602; *Letter Carriers, supra,* 418 U.S. at pp. 284-286 [41 L.Ed.2d at pp. 761-763]; *Ollman, supra,* 750 F.2d at pp. 983-984.) This broad contextual inquiry focuses on how such circumstances influenced the average reader's reasonable interpretation of the disputed statement.

The passage appeared in a regularly featured column devoted to reviews of television programming. Columns by movie or television critics, like

columns or articles which appear in the opinion-editorial pages of newspapers, are "the well-recognized home of opinion and comment." (*Ollman, supra,* 750 F.2d at p. 990 [presence of article on editorial pages one factor in holding statement one of opinion]; see *Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 874 [193 Cal.Rptr. 414].)

The point of any review—whether it be of a book, a movie, a play, a television program, or some other event—is to convey the reviewer's opinion and professional evaluation of the thing being reviewed. People read reviews expressly to find out the reviewer's opinion. Readers use that opinion to help them decide whether it is worth spending their time and/or money to attend a particular event, go to a particular place or read a particular book.

The subject matter of Bunzel's piece corroborates the conclusion that the statements in it were likely to be opinions rather than facts. Sex education in the public schools is a controversial subject. Discussion of this topic often engenders heated debate, similar in vigor to that typically experienced in labor disputes or in the political arena. (See, e.g., *Letter Carriers, supra,* 418 U.S. at pp. 284-286 [labor dispute; no evidence that the words "scab" or "traitor" were understood as defamatory facts]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 273, fn. 14 [11 L.Ed.2d 686, 702, 84 S.Ct. 710] ["climate in which public officials operate, especially during a political campaign," often includes " '[c]harges of gross incompetence, disregard of the public interest, communist sympathies . . . hints of bribery, embezzlement, and other criminal conduct' "]; *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 53 [158 Cal.Rptr. 519] [political rhetoric "often composed of equal parts of bombast, hyperbole, and billingsgate."].) Under these circumstances, a reader would be more likely to expect and understand critical commentary to be the intended statement of opinion. Viewed in this light, Bunzel's "impression" of plaintiff's directions to his producer cannot be reasonably viewed as statement of fact.

The Court of Appeal's analysis consisted of one paragraph. The court did not discuss any of the foregoing factors. Instead, it found that the disputed statement charged plaintiff with "an intentional presentation of pornography, obscenity, and lewdness" and was defamatory as a matter of law. Not only did the Court of Appeal misapply defamation principles but it exceeded the scope of appellate review.[8] For this reason, its decision cannot stand.

## IV.

The threat of a clearly nonmeritorious defamation action ultimately chills the free exercise of expression. "[T]here comes a time when the finality of

---

[8]In one sentence, the court deprived defendants of their right to a jury trial on the issue of defamation and determined that no privilege protected the statement.

litigation is almost as important as the decision therein. In the preservation of the free exercise of speech, writing and the political function, the early termination of [the] lawsuit is highly desirable. We should discourage attempts to recover through the judicial process what has been lost in the political process." (*Okun* v. *Superior Court, supra,* 29 Cal.3d at p. 461 (dis. opn. of Mosk, J.); see also *Good Government, supra,* 22 Cal.3d at p. 685.) The press cannot be codified if it is to be free. To be truly free, the press must know it is free. Individuals have a right to sue and recover for damages, but not to chill.

Moreover, "we cannot forget that the public has an interest in receiving information on issues of public importance even if the trustworthiness of the information is not absolutely certain. The First Amendment is served not only by articles and columns that purport to be definitive but by those articles that, more modestly, raise questions and prompt investigation or debate. By giving weight on the opinion side of the scale to cautionary and interrogative language, courts provide greater leeway to journalists and other writers and commentators in bringing issues of public importance to the public's attention and scrutiny." (*Ollman, supra,* 750 F.2d at p. 983.)

Here, the trial court, with these principles in mind, correctly applied the case law and concluded that the disputed statement was unambiguously one of opinion rather than fact. Having examined both the language of the statement and the context in which it was written and received, this court agrees. The Court of Appeal's contrary finding is unsupported in law or logic.

Accordingly, the judgment of the Court of Appeal is reversed with directions to affirm the trial court's judgment of dismissal.[9]

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Panelli, J., concurred.

---

[9]In view of this conclusion, the court need not reach defendants' other claims.