Thomas J. KARL, Esq.,

v.

**DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION.**

**Civ. A. No. 99–3179.**

United States District Court, E.D. Pennsylvania.

Dec. 23, 1999.

Michael J. Willner, Kane, Willner & Holman, P.C., Philadelphia, PA, for plaintiff.

Eleanor Morris Illoway, John D. Harkins, Jr., Priscilla J. Mattison, Harkins Cunningham, Philadelphia, PA, for defendants.

## MEMORANDUM

DALZELL, District Judge.

In a lawsuit that could only have been filed in late twentieth-century America, a newly minted millionaire has filed this defamation action against the producer of a seven-and-a-half minute satirical videotape that in fifty-nine film clips spoofs the transaction in which the plaintiff acquired his riches. In order to test the legal viability of plaintiff's claim, as defendant invites us to do, we must view the video with care against the screen of its public exhibition.

### I. *Background*

#### A. *Facts* [1]

Plaintiff Thomas J. Karl, Esquire, was the Vice–President, General Counsel, and Secretary for Renal Treatment Centers, Inc. ("RTC") until that firm's February, 1998 merger with Total Renal Care Holdings, Inc. ("TRC"). Karl declined offers to join the post-merger management team.

---

1. As we here consider a Rule 12(b)(6) motion to dismiss, these are the facts as plaintiff has pleaded them.

Subsequent to the merger and Karl's departure, defendant Donaldson, Lufkin & Jenrette Company ("DLJ"), the investment banker that served as TRC's adviser for the deal, organized a dinner at the Four Seasons Resort in Carlsbad, California, to which were invited employees and officers of TRC, RTC, and PricewaterhouseCoopers L.L.P. along with these individuals' spouses and significant others. Karl and other members of the RTC management team were not invited to this dinner, which was intended to mark the occasion of the TRC/RTC merger, nor were they informed or consulted about it.

It was at this dinner that the allegedly defamatory videotape was first shown. Karl claims that he was defamed when the videotape narrator's statement, "RTC's General Counsel, Tom Karl, exercised his modest severance package", was heard over footage from *Raising Arizona* showing an Old West-style bank robbery. In addition, Karl claims that DLJ caused further copies of the videotape to be distributed, that they were then forwarded to employees of DLJ and TRC, and that the video has therefore likely been shown on one or more occasions unknown to Karl, further defaming him.

### B. *Procedural Posture*

The instant complaint, alleging diversity-based defamation, was filed on June 23, 1999, and DLJ moved to dismiss it on August 18, 1999. Following Karl's opposition, the parties filed reply and sur-reply briefs. Among the many issues that divided the parties, Karl questioned the propriety of considering, in the context of a Fed.R.Civ.P. 12(b)(6) motion, the videotape itself, a copy of which DLJ had supplied with its motion to dismiss, and offered doubts about the authenticity of the tape that DLJ supplied to us. There also seemed to be an *Erie Klaxon* question of whether California or Pennsylvania law applies here. In order to aid in the resolution of this matter, on November 5, 1999 we afforded the parties leave to conduct discovery limited to the issue of the tape's authenticity, and we provided notice to the parties that we would convert the motion to dismiss to a motion for summary judgment on the limited question of the contents of the videotape. *See* Fed.R.Civ.P. 12(b). We also required that the parties stipulate to the identity of the various film and television clips used in the videotape and granted leave to them to file memoranda of law on the choice of law issue.

The parties provided us with a stipulation as to the identity of the film clips, and have stated that the videotape DLJ supplied to us is, in fact, a duplicate of that shown at the dinner.[2] We also granted Karl leave to file an amended complaint,[3] which he did on November 30, 1999, and have allowed the parties to supplement their pleadings on the motion to dismiss to address any new issues that the amended complaint arguably implicated.

We now consider DLJ's motion to dismiss under Fed.R.Civ.P. 12(b)(6), partially converted to a motion for summary judgment for the limited purpose of examining the allegedly defamatory videotape.[4]

---

**2.** For reasons unknown to us (but perhaps related to the current state of civility among many lawyers), the parties were unable to agree to a word formula for a stipulation as to the authenticity of the videotape, but have reported to us in separate communications that the videotape we received and have reviewed for the purposes of resolving the instant motion is a duplicate of that shown at the dinner.

**3.** The amended complaint included the allegations regarding the additional showings of the allegedly defamatory videotape.

**4.** "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," *Pension Ben. Guar. Corp. v. White Consol. Ind.,* 998 F.2d 1192, 1196 (3d Cir.1993), but "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* Moreover, a document that is integral to or explicitly relied upon in the complaint may be considered in a motion to dismiss, *see In re*

## II. *Legal Analysis* [5]

### A. *Choice of Law*

As discussed above, we invited the parties to supply memoranda of law concerning the law applicable in this case. Though there was no dispute that Pennsylvania choice of law rules [6] will govern here, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), neither party was willing to commit to the application of either Pennsylvania or California law. DLJ argues, after adumbrating the defamation law of both states, that there is no conflict between the law of the two jurisdictions. Karl argues that given the nature of Pennsylvania choice of law rules, a decision on choice of law would be "premature" on this "undeveloped record," *Mem. of Law of Pl. Regarding the Substantive Law to be Applied in This*

*Case* at 1.[7] Because the parties do not agree on a choice of law, and because the result here does not depend on whether California or Pennsylvania jurisprudence governs the analysis, we will cite law from both jurisdictions as we move forward.

### B. *The Law of Defamatory Meaning*

DLJ moves for dismissal on the ground that the videotape does not admit of defamatory meaning. That the communication alleged to be defamatory must in fact be of defamatory character is naturally one of the elements of the defamation tort, *see* Cal.Civ.Code § 45; 42 Pa.Cons.Stat. Ann. § 8343(a)(1), and this is a matter of law for the court, in the first instance,[8] to decide, *see Couch v. San Juan Unified Sch. Dist.*, 33 Cal.App.4th 1491, 39 Cal. Rptr.2d 848, 854 (Ct.App.1995); *MacElree*

---

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997). Here, because there was dispute over the authenticity of the tape, we permitted discovery and gave notice that we intended to convert the motion partially to one for summary judgment, *see In re Rockefeller Ctr. Properties*, 184 F.3d 280, 287–89 (3d Cir.1999) (discussing conversion of motions to dismiss into motions for summary judgment), and we therefore need not consider the parties' arguments on the issue of whether we might have considered the videotape simply on the motion to dismiss. This notwithstanding, we feel that it would be odd indeed to rule on dismissal of a claim of defamation without being able to consider the allegedly defamatory material, and it would certainly appear that the videotape here is "integral" to the complaint and "relied upon" in it. On the other hand, it is not disputed that documents of public record, including SEC documents, several of which have been submitted by DLJ, may be considered in a motion to dismiss, *see, e.g., J/H Real Estate Inc. v. Abramson*, 901 F.Supp. 952, 955 (E.D.Pa.1995).

**5.** When considering a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), we must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is 'certain that no relief could be granted under any set of facts that could be proved," *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990), *see also H.J. Inc. v. Northwestern*

*Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893 (1989). *See also* note 4, *supra*.

**6.** In *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), Pennsylvania adopted a flexible approach to choice of law, allowing consideration of "the policies and interests underlying the particular issue before the court." *Id.* at 805. This approach combines the Restatement (Second) of Conflict of Laws's "most significant relationship" analysis with governmental interests analysis, *see Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir.1978).

**7.** Karl argues that since the nature of the contacts between the dispute and the state are crucial under Pennsylvania choice of law rules, without further discovery it is not possible to determine whether California or Pennsylvania law is properly applied to this case. Karl accedes, however, that there is "prima facie plausibility" to the application of either law given Karl's residency in Pennsylvania and the publication of the tape in California, *Mem. of Law of Pl. Regarding the Substantive Law to be Applied in This Case* at 4, and thus claims that he should survive the instant motion if his complaint states a claim in either California or Pennsylvania.

**8.** If we hold that the communication could be construed as defamatory, then it is for the jury to determine if it was so understood, *see Weinstein v. Bullick*, 827 F.Supp. 1193, 1196 (E.D.Pa.1993).

*v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 674 A.2d 1050, 1053 (1996).

In California, defamatory character is defined by statute as matter that "exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal.Civ.Code § 45 (defining libel). Similarly, in Pennsylvania,

> [a] communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.... A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession.

*Maier v. Maretti*, 448 Pa.Super. 276, 671 A.2d 701, 704 (1995).

■ In considering the defamatory nature of the communication, we must look to the way in which the communication would have been interpreted by the reasonable, average person in its intended audience, *see Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 228 Cal.Rptr. 206, 721 P.2d 87, 91 (1986); *Maier*, 671 A.2d at 704, and in this inquiry the nature of the audience is therefore significant.[9] More broadly, though, the entire context of the communication must be taken into account in evaluating the potentially defamatory character, *see Baker*, 228 Cal.Rptr. 206, 721 P.2d at 90–91 (discussing California's "totality of the circumstances" test, which includes first an examination of the language and then consideration of the context in which the communication was made); *Corabi v. Curtis Publ'g Co.*, 441 Pa. 432, 273 A.2d 899, 906 (1971). This means that the communication must be examined in light of all the material surrounding it, *see Baker*, 228 Cal.Rptr. 206, 721 P.2d at 91; *Corabi*, 273 A.2d at 906.

■ ■ Simply because a communication "annoy[s]or embarrass[es] a person" does not mean that it is defamatory as a matter of law. *Maier*, 671 A.2d at 704. On the other hand, simply because a communication is funny does not mean that it cannot be defamatory. If a communication has two possible meanings, one innocent and one defamatory, then the trier of fact must consider how the communication should be interpreted, *see Polygram Records, Inc. v. Superior Ct.*, 170 Cal.App.3d 543, 216 Cal. Rptr. 252, 256–57 (Ct.App.1985), and with comedy the proper inquiry for the court is "whether the communication in question could reasonably be understood in a defamatory sense by those who received it." *Id.* at 259; *cf. Martin v. Municipal Publications*, 510 F.Supp. 255, 258 (E.D.Pa. 1981) (holding, under Pennsylvania law, that a communication purportedly intended as a "spoof" or "satire" could nonetheless have defamatory meaning).[10]

---

**9.** That is, our focus is not on how a legally trained mind would perceive the communication, but how reasonable others would likely perceive it, *see Morningstar, Inc. v. Superior Ct.*, 23 Cal.App.4th 676, 29 Cal.Rptr.2d 547, 553 (Ct.App.1994); *Corabi v. Curtis Publ'g Co.*, 441 Pa. 432, 273 A.2d 899, 907 (1971).

**10.** DLJ argues that various courts, under both California and Pennsylvania law, have found humorous materials to be incapable of defamatory meaning. As discussed in the text, this is not quite right: if a communication admits of *only* a humorous reading, then naturally it is not defamatory, but if, conversely, the communication admits of both a funny reading and a defamatory one, it may be simulta-

neously funny and defamatory. The key question is whether a reasonable member of the audience could have perceived a defamatory meaning, or whether instead the only reasonable interpretation is the harmlessly humorous one.

This distinction stems from the nature of humor itself. It has not escaped the attention of philosophers from Aristotle to Henri Bergson that humor, by its very nature, involves a butt and a beholder of the butt who feels superior to the butt. We laugh as Charlie Chaplin's tramp slips on a banana peel even though he is suffering an accident. Our laughter results from our feeling of superiority to the tramp because we think he is so incompetent that he doesn't look where he is

With this law as our analytical framework, we can now move to discuss the communications alleged as defamatory here as well as the context in which it was published.

## C. *The Videotape and Its Context*

■ Since we are evaluating the communication on a motion to dismiss, we must set out the facts in the light most favorable to Karl. As noted at the outset, the videotape was shown at a dinner attended by employees of DLJ, TRC, and PricewaterhouseCoopers L.L.P., along with their spouses. Karl alleges that while this dinner may have been held to mark the occasion of the TRC/RTC merger, we should not make the mistake of inferring that the dinner was "celebrating" the merger. Instead, this dinner at the Four Seasons Resort was held, Karl suggests, at a time of "finger-pointing" and "ugly reprisals" as shareholder lawsuits alleging securities fraud had been filed against TRC in the wake of the merger. Karl would therefore have us infer that DLJ's alleged failure to invite Karl to the dinner was far from a coincidence, but rather was intended to keep Karl away from the forum in which the videotape was shown. Having thus set the context of that night in the light most favorable to Karl, we may now discuss the videotape shown.[11]

The videotape was produced by Barrington Communications, a Los Angeles firm, under the direction of DLJ. The seven minute, fifty second-long video, entitled "Merge Wars", consists of a voice-over narration[12] describing the events that led to the founding of TRC, TRC's growth over time, and its ultimate merger with RTC. The narration mentions the names of eighteen people, predominantly employees of DLJ or TRC, in the course of explaining the various transactions and events involved, and particularly focuses on the story of Victor Chaltiel, TRC's founder. Under this narration, the video shows[13] fifty-nine separate clips from various movies and two television shows which serve to illuminate the events the narrator mentions.

The videotape's makers demonstrated a broad reach[14] in selecting the clips used in the video, as the following list (to which the parties have stipulated), presented in order of appearance,[15] shows:

> [Music from] *Star Wars; The Ten Commandments* [1956 version]; *Pinky and the Brain; Mouse Hunt; The Attack of the Killer Tomatoes; The Candidate; Bean; 101 Dalmatians* [the recent release, not the cartoon]; [Mel Brooks's] *History of the World* [Part I]; *Airplane II; Blazing Saddles; Animal House; Chaplin; Breaking Away; The Beverly Hillbillies* [the motion picture]; *Liar*

going. Indeed, it is not surprising in this regard that Chaplin himself thought Walt Disney's Dopey in *Snow White and the Seven Dwarfs* was the funniest comic character he had ever seen. This brief philosophical detour explains why the law of defamation requires more than a pure joke. It requires reasonably cognizable harm to the butt's real-world reputation.

11. We recognize that any attempt to render into written form the contents of filmed expression risks awkwardness, or worse, *see, e.g.,* Michael Kinsley, *Viewpoint,* Wall St. J., July 17, 1986. We shall nevertheless do our best to do justice to this clever work.

12. If not by *Saturday Night Live* and *Jeopardy* announcer Don Pardo, then someone who sounds quite like him.

13. For some of the clips, only a visual image is used; for others, both the image and sound of the movie or television show are used.

14. And considerable skill. For example, to illustrate the narrator's statement that one of the female principals overheard two male executives, the producers chose first a scene from *Lady on a Train* showing Cybill Shepherd walking down a passenger-train car corridor and looking into a compartment, and then cut to a scene from *Dirty Rotten Scoundrels* in which Steve Martin and Michael Caine's characters are having a conversation inside a train compartment.

15. Because some movies were used for clips more than once, some titles appear more than once.

*Liar; Planes, Trains and Automobiles; The Brinks Job; The Great Dictator;* Abbott & Costello—source unknown; *Scarface; Brewster's Millions; The Getaway; Brewster's Millions; How to Succeed in Business Without Really Trying; Don Juan DeMarco; Tootsie; Monty Python's The Meaning of Life; Big; The Great Dictator; Fast Times at Ridgemont High; High Noon; The Wizard of Oz; Grumpy Old Men; Mouse Hunt; Waiting for Guffman; The Paper Chase;* [beefcake] beach shots—source unknown; *Lady on a Train; Dirty Rotten Scoundrels; Bridge on the River Kwai; A Night to Remember; The Flintstones* [John Goodman version]; *Dumb and Dumber; The Firm; The Empire Strikes Back; Planes, Trains and Automobiles; Help!; Rocky & Bullwinkle; The Getaway; Romancing the Stone; The Godfather;* apes shaking hands—source unknown; *Raising Arizona;* Varig 727 landing—source unknown; *Face/Off; Dick Tracy; LA Story;* storefront with substitute sign—source unknown; Apollo 13 rocket taking off—source [said to be] unknown.[16]

The humorous impact of the video—and even Karl concedes that "[m]uch of the portrayals and commentary ... were light-hearted", First Am.Compl. · ¶ 4—largely stems from the disjunction between the "straight" narration[17] and the scenes shown behind it, as several examples will show. Early in the video, for instance, we hear, "In 1994, David Dennis[18] proposes to Tenet Health that it divest medical ambulatory care, one of its hottest properties." The last portion of this line is said against the backdrop of a scene from the film *Mouse Hunt* in which two characters enter a decrepit and cobwebbed building and

remark, "What a dump!" Later we hear, "TRC was a sure-fire investment that everyone wanted a piece of" against a clip from the film *Chaplin* in which a man on a music hall stage is pelted with vegetables and refuse from the audience. The narrator's statement, "And fortunately, Bob and Victor hit it off right from the start", is paired with a clip from *Waiting for Guffman* in which a man shouts into a telephone, "I just hate you, and I hate your ass face!" And so on.

Moreover, the video contains many clips which contrast the discussion of a particular individual's acts with clips showing behavior of a different sort. "Chet Mehta preps Victor for an interview on CNBC" is spoken over a scene from *Dumb and Dumber* in which the title characters are given their trademark haircuts. "Finally, Rich finished the due diligence" is paired with a clip from *Bridge on the River Kwai* in which a bedraggled Colonel Nicholson is pulled out of solitary confinement by two Japanese guards. "David Dennis displayed his knowledge of dialysis" is coupled with the famous scene from *Monty Python's The Meaning of Life* in which Michael Palin's hospital administrator walks into a delivery room, complete with a patient in stirrups and berobed physicians, and remarks, "Ah, I see you have a machine that goes 'bing'!"

Near the end of the video is the seven-and-a-half second clip that allegedly defames Karl. The narration for this scene says, "RTC's General Counsel, Tom Karl, exercised his modest severance package." The images behind these words are taken from a bank robbery scene in the Coen Brothers' comedy, *Raising Arizona.* We first see two men wearing tan dusters and

16. Notwithstanding the parties' stipulation, we take judicial notice that this last clip in fact came from Ron Howard's *Apollo 13,* starring Tom Hanks.

17. We note that throughout the video, though the text of the narration is mock neutral, the delivery is in an ironic tone.

18. Because we do not have access to a transcript of the narration, all the names taken from the transcript are spelled phonetically, with apologies to anyone whose name is misspelled.

holding shotguns. The video's producers then cut to a floor-level shot, taken from behind the robbers, of the bank patrons getting on the ground.[19] We then see bundles of cash being put into a bag (evidently by a teller), and quickly we see one of the robbers taking the bag of money from the teller window.

For the sake of completeness, we also describe the immediate context of this portion of the tape. The two preceding scenes are: "The proxy solicitation [of TRC shareholders to approve the merger with RTC] was just good, old-fashioned salesmanship" said over the famous clip from *The Godfather* in which Don Corleone (Marlon Brando) says, "I'm going to make him an offer he can't refuse"; and, "And in the end, Victor and TRC shareholders came to terms and completed the deal" voiced over stock footage of two apes touching hands. After the scene about Karl, we hear, "And finally, Victor's plane arrived" over images first of a VARIG airlines jet landing and second of a plane crash-landing through a warehouse taken from the movie *Face/Off.*

### D. *Does the Videotape Have Defamatory Character?*

Given the law discussed above, and the context of the videotape that we have just at length rehearsed, the question for us to consider boils down simply to whether anyone in the dinner audience viewing the videotape could reasonably have considered it to expose Karl to "hatred, contempt, ridicule, or obloquy," or to harm his reputation, or to "lower him in the estimation of the community." For the reasons discussed below, we find that no reasonable audience member could have so considered this portrayal, and thus Karl's suit for defamation must fail.

19. Although not replicated in the videotape, the full robbery scene in the film, of which we take judicial notice, contains signature Coen Brothers' dialogue between robbers and patrons as to which of the robbers' two commands the patrons should obey: should they

As discussed and illustrated above, the overall tone of the video is lighthearted, and Karl concedes that this is so. Karl claims, however, that "in referring to Mr. Karl, the portrayal became vicious and derogatory in tone and content crossing far over the line", First Am.Compl. ¶ 4. In essence, Karl alleges that for just these seven-and-a-half seconds, the video suddenly turns serious in order to savage only his reputation. The reality, however, is that the portrayal of Karl is indistinguishable from how others mentioned in the video are depicted.

For one thing, Karl is not the only one in the video who is associated with a film clip showing criminal activity. As noted above, the "sale" of the RTC/TRC merger to TRC shareholders by Victor Chaltiel was exemplified by the *Godfather* clip where the head of the Corleone crime family discusses making "an offer he can't refuse." In a discussion of TRC's going public in 1995, the narrator states, "The deal proved good for everyone", over a clip from *The Brinks Job* showing the successful robbers cavorting in piles of money. The image of Al Pacino's Scarface, from the film of the same name, counting out huge piles of his drug money is shown under, "Through the efforts of [TRC] CFO John King...." Karl's fellow RTC executives, Bob Mayer and Fred Jansen, are portrayed as Steve Martin's and Michael Caine's con artists from *Dirty Rotten Scoundrels*, with Steve Martin's character saying (with respect, for the purposes of the video, to the TRC/RTC merger), "I say, let *them* give us money; let's live off of *them* for a while." Also, a shot of gangster Big Boy Caprice (Al Pacino) and his henchmen from *Dick Tracy* is shown under, "What's in store for Victor and [unintelligible [20]] TRC?"

"Freeze!" or "Get Down!"? As the colloquy points out, these two acts are mutually exclusive. *See Raising Arizona* (Twentieth Century Fox 1987).

20. Possibly "the poolable".

Moreover, Karl is not the only RTC executive who is mentioned in the video. Two RTC "principals", Bob Mayer and Fred Jansen, are portrayed, as discussed above, as con artists and also as "grumpy old men" in a clip from the movie of the same name.[21]

Karl is also not the only one whose financial package is discussed in the video. As the narrator intones, "Victor [Chaltiel] displayed characteristic flexibility throughout, particularly when questioned about his options package," we see a scene from *Planes, Trains and Automobiles* in which a man (probably Steve Martin's character) throws a fit of anger in a parking lot, shouting "Goddamn it! ... Goddamn it! ..."

The bottom line is that Karl's segment is, in tone and content, exactly the same as heard and seen over and over again in the rest of the video. Karl's portrayal simply cannot be distinguished from the pack.

Karl nevertheless urges us that his portrayal would have been interpreted by the audience to mean that his exercise of the severance package was in fact nothing short of an robbery in which he took money he did not deserve. The video, says Karl, actually ascribed to him "unethical and immoral felonious criminal conduct," which lowered him in the estimation of the health care and acquisition professionals who viewed it, First Am.Compl. ¶¶ 21–26. According to Karl, this portrayal was part of a larger scheme to discredit him because he refused to participate in the new management team, and because business problems from the merger were beginning to develop. He also argues that he was singled out for the alleged ridicule despite the undisputed reality that other former RTC executives had even larger severance packages than his $210,000.[22]

True though all this may be—and as we must assume it to be—it is beside the point. Although we certainly must take the larger context of the video into account, including the identity of the audience and the known relationships between the parties, we must also consider the context and totality of the publication itself. Here, the allegedly defamatory video constituted less than two percent of a larger communication, and the substance of this larger communication makes clear to any reasonable observer that the portrayals, including that of Karl, are not to be taken literally or as a statement of fact or opinion. While, as we discussed above, humorous things can be defamatory, the type of humor demonstrated in this video is clearly that of the ridiculous. Only if we were willing to hold—which we do not—that a reasonable viewer could have believed that the TRC management are Mafiosi *capos*, or that Victor Chaltiel and the TRC shareholders are chimpanzees, or that John King is a drug lord, could we find that a reasonable viewer could have been left with the belief that the videotape conveys the message that Karl's severance gains were ill-gotten or that Karl's reputation could thereby have been damaged.[23]

No one, even those familiar with the underlying transactions or with the possible tensions between Karl and DLJ/TRC, could have reasonably interpreted the Karl segment as anything other than a joke.

---

21. Mayer and Jansen are also portrayed in a scene in which the narration, "The two proved eager to do [with respect to the TRC/RTC merger] what was best for everyone", is heard over a clip from *Mouse Hunt* where one character says, "These pigeons are ripe for the plucking," certainly a suggestion that they were feathering their own nests in the deal.

22. As stated at the outset, Karl did become a millionaire (pre-tax, anyway) from the deal: in addition to the $210,000 severance package, he received bonuses associated with the merger totaling $990,000, *see* Mem. in Supp. of Def.'s Mot. to Dismiss Ex. A (RTC's Schedule 14A filed with the SEC) at 68–69.

23. Again, although we look to context as part of our inquiry into defamatory meaning, our concern here is with the communication of the videotape, not any other communications, and we hold that the statements in the videotape do not reasonably admit of a defamatory meaning.

Although Karl's pleadings may show an overall context in which DLJ/TRC had a motive to defame Karl, it does not logically or legally follow that the videotape, merely because it was produced by DLJ and shown to DLJ and TRC employees, necessarily had defamatory content. Again, and at the risk of repetition, the Karl video segment is clearly, to any reasonable viewer, a joke indistinguishable from the fifty-eight other jokes in the video, and its images of bank robbery cannot be reasonably imputed to defame Karl's character.

Karl emphasizes in his pleadings that the additional showings of the tape in as-yet undisclosed locations to as-yet undisclosed audiences means that it would be improper for us to dismiss his case at this point, since we are, he avers, not in a position to evaluate the potentially defamatory impact that the tape had on these unknown viewers. However, we need not know the identity and affiliation of each audience member to make our decision about this videotape: no matter who the other audiences are, this depiction has no defamatory character.

In fact, having found that the audience at the dinner could not reasonably have found the videotape to be defamatory, we can be confident that audiences more removed from the transaction in question could equally not reasonably perceive defamation here. This is so because Karl's complaint relies on a distinction between the others portrayed in the videotape and himself. But because, as we discuss above, the tone and content of Karl's depiction is identical to that used for the seventeen other Masters of the Universe named in the tape, the distinction could only conceivably be perceptible if the viewer has information not presented in the videotape about the identities and roles of these individuals. To the extent that the as-yet unknown viewers of the tape were familiar with the transaction, they would be in the same posture as the audience members at the dinner, who we have already concluded could not reasonably have

perceived defamation. To the extent such viewers were ignorant of the deal, they reasonably would never consider that these were "criminals" offered up for obloquy or contempt.

In short, reasonable viewers would see only something harmlessly funny, and, unlike Karl, they would laugh.