**Jeffrey M. MASSON, Plaintiff,**

**v.**

**The NEW YORKER MAGAZINE, INC.; Alfred A. Knopf, Inc.; Janet Malcolm, Defendants.**

**No. C–84–7548 EFL.**

United States District Court, N.D. California.

Aug. 17, 1987.

Charles O. Morgan, San Francisco, Cal., for plaintiff.

Karl Olson, Cooper, White & Cooper, San Francisco, Cal., for defendants.

## ORDER GRANTING SUMMARY JUDGMENT

LYNCH, District Judge.

### I. INTRODUCTION

This is an action for defamation and invasion of privacy brought by Jeffrey Masson against defendants Janet Malcolm, *The New Yorker* magazine, and Alfred A. Knopf, Inc. The dispute arises out of an article written by defendant Malcolm based primarily upon extensive tape-recorded interviews given to Malcolm by Masson.

Malcolm's article describes how Masson quickly became relatively prominent in the field of psychoanalysis, and was appointed Projects Director of the Freud Archives. Masson claimed to have made many discoveries regarding material that had been suppressed by the psychoanalytical "establishment." The article explains Masson's belief that this information leads to conclusions that will result in the destruction of established psychoanalytic theories and of psychoanalysis itself. As a result of his outspoken criticism of Freudian psychoanalysis, he was fired from his position at the Freud Archives, and rejected by his colleagues.

The 48,500–word article was published in successive issues of *The New Yorker* magazine on December 5 and 12, 1983, and was reprinted by defendant Knopf in a 165–page book entitled *In the Freud Archives.* The publications were based upon 1,065 pages of tape transcripts and notes. Plaintiff claims that misquotations in the article and book[1] falsely portray him as egotistical, vain, and lacking in personal honesty and moral integrity.

This Court has required plaintiff to amend his complaint to specifically identify each passage in the article upon which he relies in asserting that the article is libelous. In his Fourth Amended Complaint, Masson identified twelve allegedly libelous passages. On August 19, 1986, this Court granted partial summary judgment, holding that four passages were substantially true and could not be relied upon to support plaintiff's claim of libel. Currently before the Court is defendants' second motion for summary judgment. Defendants argue that no genuine issue of material fact exists on the issue of whether defendants published any of the remaining eight statements with actual malice.[2]

For the reasons discussed below, this Court grants summary judgment in favor of all defendants.

### II. APPLICABLE LAW

The parties agree that plaintiff is a public figure. A libel plaintiff who is a public figure bears the burden of proving with clear and convincing affirmative evidence that defendants published a statement with actual malice. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.
>
> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.

*Id.*

The actual malice standard requires proof of a subjective mental element of knowing falsity or a reckless disregard of falsity by a defendant. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Reckless disregard can be established only if defendants "in fact entertained serious doubts" about the truth

---

1. The book and the article are substantially identical in content, and will be jointly referred to as "the article."

2. Several of the statements alleged in the Fourth Amended Complaint were not alleged in prior complaints and thus were not considered by this Court in its prior order. Plaintiff also argues, based upon newly-discovered evidence, that this Court erred in its prior order when it held that one of the statements was substantially true.

of the story before publication. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The actual malice inquiry focuses on defendants' state of mind regarding the truth of the statements. *Monitor Patriot Company v. Roy*, 401 U.S. 265, 276, 91 S.Ct. 621, 627, 28 L.Ed.2d 35 (1971). Therefore, in order to defeat a properly supported motion for summary judgment, plaintiff must produce clear and convincing evidence that defendants knowingly and falsely published the alleged defamatory statements, or in fact entertained serious doubts as to the truth of the alleged statements, yet recklessly disregarded those doubts.

Courts have "clearly recognized the need for a certain degree of literary license when properly applying the *New York Times* standard to the facts of each case." *Reader's Digest Association v. Superior Court*, 37 Cal.3d 244, 261, 208 Cal.Rptr. 137, 690 P.2d 610 (1984). "[E]rroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *Id.* (quoting *New York Times*, 376 U.S. at 271–72, 84 S.Ct. at 721–22). A writer is entitled to select one of several possible rational interpretations of an event which "bristled with ambiguities and descriptive challenges" for the author. *Reader's Digest*, 37 Cal.3d at 262, 208 Cal.Rptr. 137, 690 P.2d 610 (quoting *Bose Corporation v. Consumer's Union*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)). "The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." *Bose*, 466 U.S. at 513, 104 S.Ct. at 1966.

■ Similarly, fictionalization or dramatization of conversations does not satisfy the requirement of clear and convincing

evidence from which a jury could find defendants published the alleged defamatory statements with actual malice, so long as the change does not "increase the defamatory impact or alter the substantive content" of the actual statement or statements upon which the author relied. *Hotchner v. Castillo–Puche*, 551 F.2d 910, 914 (2d Cir.), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). The inclusion of quotation marks in a passage does not require complete accuracy; a writer may resort to rhetorical license. *Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 263–64, 228 Cal.Rptr. 206, 721 P.2d 87 (1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987).

### III. DISCUSSION

This Court has carefully analyzed each disputed passage separately,[3] comparing the alleged defamatory material with relevant portions of the tape-recorded interviews to determine whether rational jurors could find by clear and convincing evidence that defendants entertained serious doubts about the accuracy of the printed material.[4]

No direct evidence of actual malice exists. The writer, Malcolm, has stated in a declaration that she does not think, "and did not think before publication, that any quotations in the article or book were distorted or taken out of context." She has further maintained that:

I quoted Mr. Masson accurately, I presented him as he presented himself to me, and in writing my article/book I was consistently and solely guided by the ambition of making him as lifelike and real as possible so that my readers would get the same sense of him that I had received from actually knowing him. I invented nothing. I never harbored the slightest ill-will toward Mr. Masson....

3. This method of analyzing each claimed defamatory statement separately was approved in a situation such as this case, in which the defamatory impact of the publication as a whole is the same as the defamatory implication conveyed by each of the individual statements. *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). In this case, the defamatory impact is that Masson is a vain, arrogant egotist.

4. Malcolm has also submitted handwritten and typed notes as support for her claim that she did not entertain serious doubts about the statements' accuracy. Plaintiff disputes the accuracy and authenticity of the typed notes; therefore, this Court will disregard those notes in its analysis.

Declaration of Janet Malcolm in Support of Defendants' Motion for Summary Judgment at 5.

Plaintiff claims that the requisite malice can be inferred simply based upon the alleged literal inaccuracy of the statements or the fact that Masson did not actually use the precise words that Malcolm attributed to him. However, this method of inferring malice has been disapproved by the Supreme Court. *Bose,* 466 U.S. at 512, 104 S.Ct. at 1966; *Time, Inc. v. Pape,* 401 U.S. 279, 285–86, 91 S.Ct. 633, 637–38, 28 L.Ed.2d 45 (1971). A report of what someone has said about an event "can contain an almost infinite variety of shadings." *Id.* at 286, 91 S.Ct. at 637. The fact that an author selected "one of a number of possible rational interpretations" of a conversation or event that "bristled with ambiguities" is "not enough to create a jury issue of 'malice'". *Bose,* 466 U.S. at 512–13, 104 S.Ct. at 1966; *Time, Inc.,* 401 U.S. at 290, 91 S.Ct. at 639. This Court therefore focuses its inquiry on whether the author's choice of words in each disputed passage was a rational interpretation of Mr. Masson's tape-recorded statements.

A. *The Disputed Passages*

    1. "It Sounded Better"

Malcolm quoted Masson as stating: My father is a gem merchant who doesn't like to stay in any one place too long. His father was a gem merchant, too ... named Moussaieff, who went to Paris in the twenties and adopted the name Masson. My parents named me Jeffrey Lloyd Masson, but in 1975 I decided to change my middle name to Moussaieff—it sounded better.

On tape Masson stated that he wanted to "give back Moussaieff," and that he "just liked it"; it was "sort of part of analysis, a return to the roots, and your family tradition and so on."

In the August 19, 1986 Partial Summary Judgment Order, this Court noted that it could see little difference between Masson's own words and those attributed to him by Malcolm. The article does inform the reader that Moussaieff was a family name, and the slight difference between the phrase "It sounded better" and "I just liked it" is not sufficient to raise a triable question of fact on the issue of actual malice. The phrase used was a rational interpretation of Masson's own statements.

    2. "He Had the Wrong Man"

Masson alleges that Malcolm "willfully distorted the context" of Masson's remark that Dr. Eissler had the "wrong man" if he expected Masson to "just live with" his firing from the Freud archives in silence.

Masson's remarks in the transcript of the tape-recorded interviews are as follows:

But it was wrong of Eissler to do that, you know, he was constantly putting various kinds of moral pressure on me, and, "Do you want to poison Anna Freud's last days? Have you no heart?" He called me up, "Have you no heart? Think of what she's done for you, and you are now willing to do this to her." I said, "What am I, What have I done? You're doing it, you're firing me. What am I supposed to do, thank you? Be grateful to you?" He said, "Well, you could never talk about it, you could be silent about it, you could swallow it. I know it's painful for you, but just live with it in silence." *"Fuck you,"* I said, "Why should I do that Why? You know, why should one do that?" "Because it's the honorable thing to do, *and you will save face, and who knows, if you never speak about it and quietly and humbly accept our judgment, who knows in a few years if we don't bring you back?* Well, he had the wrong man.

The above passage appeared in the article with the emphasized phrases omitted, as follows:

Eissler had no business extracting that promise from me. He was always putting moral pressure on me. "Do you want to poison Anna Freud's last days? Have you no heart? You're going to kill the poor old woman." I said to him, "What have I done? You're doing it. You're firing me. What am I supposed to do, be grateful to you?" "You could be silent about it. You could swallow it. I know it is painful for you. But you could just live with it in silence." "Why

should I do that?" "Because it is the honorable thing to do." Well, he had the wrong man.

Plaintiff claims that the quoted passage suggests that he was unwilling to remain silent in order to do the honorable thing; when, in fact, he meant that he was unwilling to remain silent in the hopes of getting his position back. This Court, in its previous order, noted that the quotation and Masson's actual statement are very similar. Although the Court found a triable issue of fact with regard to the quotation's substantial truth, no question of fact exists on the issue of actual malice.

An author has the right to "choose appropriate words and phrases." *Reader's Digest,* 37 Cal.3d at 264, 208 Cal.Rptr. 137, 690 P.2d 610. "Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories.... [U]nder the First Amendment the decision of what to select must always be left to writers and editors. It is not the business of government." *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1306 (8th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). Malcolm's omission of Masson's comments, including his use of profanity directed toward Mrs. Freud, was a proper exercise of literary license.

### 3. "Intellectual Gigolo"

In the article, Malcolm quotes Masson, discussing an affair he had with a graduate student, as stating: "She said, 'Well, it's very nice sleeping with you in your room, but you're the kind of person who should never leave the room—you're just a social embarrassment anywhere else, though you do fine in your own room.'" This quote appears nearly verbatim in the transcript of the tape-recorded interviews. The article then continues, quoting Masson as remarking: "And, you know, in their way, if not in so many words, Eissler and Anna Freud told me the same thing. They liked me well enough 'in my own room.' They loved to hear from me what creeps and

dolts analysts are. I was like an intellectual gigolo—you get your pleasure from him, but you don't take him out in public." [5]

Plaintiff suggests that this quote gives the false impression that his intellect and beliefs were for sale. This Court disagrees. The author was attempting to describe Masson's belief that Freud and Eissler enjoyed his opinions and beliefs in private, but would not be associated with those views in public. Malcolm chose to describe this belief by using an analogy to his sexual experience with the graduate student. The descriptive term "intellectual gigolo," as used in this context, simply means that Masson's views were privately entertaining, but publicly embarrassing to Freud and Eissler.

Masson made several statements to that effect in the tape-recorded interviews. For example:

MALCOLM: Yeah, well, you know, you said something which I was just reminded of when you were talking, when you quoted that girl who said she liked sleeping with you but she didn't want to have anything else to do with you, when you said something about how the analysts thought you were, uh, that you were this private asset but a public liability.

MASSON: Yes, yeah, that's true, yeah.

MALCOLM: So, there was that kind of double standard, like between teammates, you know, you can ... horse around together in the privacy of your own home but—

At another point in the interviews Masson commented:

They felt, in a sense, I was a private asset but a public liability. They liked me when I was alone in their living room, and I could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me.

Malcolm's use of the descriptive term "intellectual gigolo" was a rational inter-

---

**5.** This quote is found in Malcolm's notes; however, because the accuracy of the notes is dis-

puted by plaintiff, they will not be considered.

pretation of Masson's comments. No reasonable juror could find by clear and convincing evidence that Malcolm entertained serious doubts about the accuracy of this passage.[6]

### 4. "The Schreber Case"

#### a. "Discovery"

Freud's study of Daniel Schreber provided evidence for his theory that homosexuality originates from unconscious, paranoid fantasies. Masson contends that Malcolm falsely quoted him as having claimed for himself certain discoveries about the Schreber case, when in fact Masson acknowledged that the discoveries had been made by another analyst, William Niederland. According to Masson, informed readers would know that Niederland had made the discoveries; therefore, the passage portrays him as falsely claiming credit for another's work.

In the article, Malcolm reports Masson as stating:

> It was the same thing with my discovery about the Schreber case. That was even more appalling. I found a 1884 article in Freud's library written by Paul Flechsig, Schreber's psychiatrist, which he had personally sent to Freud; reporting that he performed castration experiments on hysterical and obsessional patients in his asylum. This means that when Freud wrote his essay on Schreber he knew that castrations had taken place in the asylum where Schreber was held, but he still could write that Schreber suffered from the *delusion* that the great Paul Flechsig wanted to castrate him.

Masson alleges that, in the tape-recorded interview, he emphasized that Niederland was the one who first discovered Flechsig had performed castrations, and that Masson was only claiming he had gone one step further and discovered Flechsig had sent Freud a copy of his article reporting the castrations. This passage was not alleged by plaintiff in his previous complaints, and

was not before the Court at the time of its prior order. If the Court had considered this statement in the August, 1986 Order, it would have held that it was substantially true. The article makes clear the fact that the discovery Masson was claiming was that Flechsig had sent Freud the article and the article was in Freud's library. Masson's interpretation of the passage is disproved by the plain meaning of the words used. No reasonable juror could find by clear and convincing evidence that Malcolm entertained serious doubts about the truth of the printed material.

#### b. "Moral Cowardice"

Masson also claims, in his opposition to defendants' motion for summary judgment, that Malcolm falsely quoted him as accusing Freud of moral cowardice. This allegation is not contained in plaintiff's Fourth Amended Complaint, and thus may not be considered. Even if this Court were to consider the claim, it has no merit. The statement Masson complains of is as follows:

> I think Freud was a great and remarkable thinker, but he wasn't honest. He was a man who just lost his courage. His entire theory after he abandoned seduction was the product of moral cowardice, because Freud knew that Schreber was in an asylum where they were trying to castrate him, and he never mentions it.

The tape transcript contains numerous references to Freud's dishonesty and lack of courage regarding the Schreber case. For example, Masson states: "I think he was a great and remarkable thinker but he was still a, a, a man who just lost his courage. He was a brilliant mind who didn't have the courage to stick with things that he knew were true." Later in the transcript Masson remarks: "It's not honest in the end.... And it was the first piece ever written on the psychology of homosexuality.... It's a brilliant and con-

---

6. Plaintiff also argues that a juror could find Malcolm entertained serious doubts about the accuracy of the passage because the quotation is attributed to a tape-recorded conversation at a restaurant in Berkeley, when in fact Masson did not make the statement at that specific time or place. When or where the statement was made is not a material fact. Malcolm was entitled to put quotes from two different times into the same paragraph, as long as the "gist" or "sting" of the passage was not changed. Distortion of chronological sequence alone is not actionable. *Janklow*, 788 F.2d at 1305–06.

vincing thesis. And it's dishonest." At another time, Masson emphasizes: "And that's dishonest, too, you see. Time and time again, Freud is dishonest." Malcolm's article accurately reports Masson's views about Freud regarding the Schreber case. Her use of the descriptive phrase "moral cowardice" was a rational interpretation of Masson's comments.

### c. "There Aren't Too Many Interpretations Possible"

Masson next claims that Malcolm took his statement, that there aren't too many interpretations possible of his discovery, out of context and furthered the false image of Masson as a vain egotist by falsely quoting him as saying that Eissler would have admitted Masson was right. The passage as it appeared in the book is as follows:

> "There aren't too many interpretations possible of my discovery," Masson said grimly. "I think Eissler would have admitted that I was right. I think if I had said to him, 'Look I'm never going to make this public—this is just between you and me—but just take a look at this,' he would have said, 'Yes, you're right. But never, never tell the goyim.'"

In the transcript, Masson discusses two discoveries he made regarding the Schreber case. The first discovery was that Freud had the article from Flechsig in his possession and therefore presumably knew that Flechsig was performing castrations. The second was that Freud had written a letter to another person acknowledging that Schreber's father was a "tyrant." The significance of the second discovery was that Freud had written in his article that Schreber suffered from delusions about his father. According to Masson, Freud stated that Schreber's father was a wonderful physician when he knew that the father was a vicious tyrant.

The disputed portion of the article discusses only the first discovery, and quotes Masson as claiming that Eissler would agree with him about that discovery. The transcript, in fact, contains the following comment by Masson regarding his discovery of Freud's possession of the Flechsig article: "What will Eissler do with it? What will he say in excuse? Cause he will find an excuse. He'll say, 'It's perfectly normal that Freud didn't mention it.'" Masson points to this quote in support of his claim that the article, which quoted him as claiming Eissler would agree with him, is defamatory.

However, another part of the transcript contains the following conversation:

MASSON: He [Freud] could say: I have here in my library an article by Paul Flechsig, in which he recommends castration. Now, you may wonder whether this had anything to do with Flechsig, with Schreber's delusions. My answer is: It did not.

MALCOLM: Uh huh.

MASSON: And it leaves the reader the opportunity to think about it by providing evidence he knew to be germane to the issue, but Freud doesn't do that.... I even wrote in my Schreber paper when I—the one that I met with Eissler over, I said, "I cannot believe that Freud knew the works of the father. I simply do not believe he knew them because if he did, he wouldn't be able theoretically to ignore this and—

MALCOLM: Yeah.

MASSON: Now, I know that's not true.

MALCOLM: So what did Eissler say then?

MASSON: He agrees with me, of course.

In another part of the tape-recorded interviews, Masson and Malcolm have the following interchange: MASSON: Not my views because they're really the views that he would have shared. I mean if I could've had enough time with Eissler looking at these documents, he would have said, "You're right, but let's never tell anybody. Let's—"

MALCOLM: You mean he, he would've —But he seemed to disagree that the, the seduction theory was, was correct. He kept saying, "No, it's wrong and he knew that Freud knew it was wrong and—"

MASSON: Yeah but if, I mean if he had let me talk to him long enough about all the new material, he would've had to share more or less my point of view.

MALCOLM: Um-hmm. You really think so?

MASSON: Oh yeah.

MALCOLM: You think you could have persuaded him?

MASSON: Oh yeah, oh yeah....

....

MASSON: But it, yeah, but I don't think there are too many interpretations possible of this kind of material. You know it's just overwhelming the amount of, of information that's been suppressed and so on....

MALCOLM: Yeah, I see.

MASSON: You know and I think Eissler would have admitted that. I think if I had said to him: "Look, you know, I'm not going to ever say this, but just between you and me—," he would've said, "Yes, you're right, but never, never tell the goyim."

Masson claims that the "material" mentioned in the above-quoted passage refers only to omissions from published Freud letters. However, in light of the somewhat confusing references to "discoveries" and "new material" in the transcript, plaintiff's statements quoted above could reasonably be seen as pertaining, at least in part, to plaintiff's discovery about the Flechsig article. The published passage was a rational interpretation of a series of ambiguous conversations with Masson, and cannot support a finding of actual malice.

5. "I Don't Know Why I Put It In"

Masson wrote a paper and delivered it to a group of psychoanalysts. The concluding paragraph of that paper blamed Freud for the sterility of psychoanalysis. Masson claims Malcolm falsely quoted him as stating: "That remark about the sterility of psychoanalysis was something I tacked on at the last minute, and it was totally gratuitous. I don't know why I put it in."

Malcolm maintains, in her declaration, that she remembers Masson making that comment; however, the phrase "I don't know why I put it in" is not contained in the transcript. Masson admits that the subject of the last paragraph came up often, but he emphasizes the fact that he told Malcolm on many occasions that he put the last sentence in because he really believed it was true.

Masson did, however, admit that the last paragraph was "unfortunate, and poorly worded." In the transcript, Masson also comments: "I think the last sentence was, an in, possibly gratuitously offensive way to end a paper to a group of analysts." He also stated: "I don't know why psychoanalysis is sterile today."

The "sting" of the quoted passage is that Masson made the remark with little thought and on the spur of the moment. The definition of "gratuitous," a word Masson used in the taped interview to describe his decision to include the remark, is: "being without apparent reason, cause, or justification ... spontaneous...." *The Random House College Dictionary* 576 (rev. ed. 1982). It is also defined as: "not called for by the circumstances ... adopted or asserted without good ground." *Webster's Third New International Dictionary* 992 (1981).

Malcolm asserts in her declaration that she conveyed what she believed Masson meant to convey, that it was an impulsive decision. The passage as written is a rational interpretation of Masson's comments, including his characterization of the last sentence as a gratuitously offensive way to end the paper. No reasonable juror could find that this passage provides clear and convincing evidence that Malcolm entertained serious doubts as to the truth of the statement.

Masson also complains that Malcolm accused him in the article of being silent and "sidestepping" her question about his change into an anti-Freudian. Malcolm wrote that she "asked him what had happened between the time of the lecture and the present to change him from a Freudian psychoanalyst ... into the bitter and belligerent anti-Freudian he had become. Masson sidestepped my question." Later in the article, Malcolm noted:

At no time during our acquaintance did Masson answer my question about what had brought on his sudden virulent anti-Freudianism. As I came to realize, it was not the right question—as is proba-

bly the case with all unanswered (unanswerable) questions.... But if Masson was silent about—and possibly ignorant of—the motive for his psychoanalytic volte-face, he was anything but reticent about the reversal of his fortunes that the Blumenthal articles brought about.

Malcolm, in her declaration, justifies her use of the terms "silent" and "sidestepped" as follows:

The ... passages convey my opinion that Mr. Masson gave no single, simple, satisfactory explanation for his evolution from a Freudian into an anti-Freudian, and that on many occasions he sidestepped my question.... I also believe—and I explained in the article—that the question is probably *unanswerable*.... I tried to, and did, give much of Mr. Masson's explanations of his views. But while Mr. Masson went on at great length about his views of, and condemnation of, Freud and the Freudian school, he never, at least in my opinion, gave a satisfactory explanation of what caused the transformation in his views.

Malcolm's characterization of Masson as silent and of sidestepping her question are clearly constitutionally-protected expressions of opinion. *See Baker v. Los Angeles Herald Examiner,* 42 Cal.3d 254, 263, 228 Cal.Rptr. 206, 721 P.2d 87 (1986); *see also Janklow,* 788 F.2d at 1304 ("colorful, even feisty language" used in magazines "signal[s] the reader to expect a fair amount of opinion"). The phrase "but if Masson was silent" is cautionary language signaling opinion. *Id.* at 1302.

### 6. "Denise Worries Too Much"

Malcolm described a conversation that took place during lunch among Masson; his girlfriend, Denise; and his daughter, Simone. Malcolm did not tape-record that conversation, but she subsequently made notes on, and tape-recorded two further conversations on the same topic: Denise's concern about Masson's apparent indifference to the hurt feelings of Eissler and Gardiner. The passage in the article is as follows:

During lunch, Denise suddenly turned to Masson and said emotionally. "Those old people—Eissler and Muriel Gardiner —I worry about them. I feel their pain.... You touched Eissler, and you hurt him. I see him bearing the pain. But you don't feel it, Jeff. You just don't feel it. I worry about that." "Denise worries too much," Masson said imperturbably.

Masson does not dispute the conversation took place, but he claims he did not make the statement, "Denise worries too much." He argues that the quote was fabricated to make him appear careless and indifferent to the feelings of those he loved. Malcolm, in her declaration, claims that she remembers Masson making the comment. Her interpretation of the quote is that it was Masson's way of saying that Denise did not fully understand the complex situation between himself and Eissler.

In this Court's opinion, plaintiff's allegation regarding this passage is triviality to the highest degree. It is doubtful that the quote is even defamatory. "A publication is not responsible for every strained interpretation a plaintiff might put on its words." *Jennings v. Telegram–Tribune Co.,* 164 Cal.App.3d 119, 127, 210 Cal.Rptr. 485 (1985) (quoting *Forsher v. Bugliosi,* 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716 (1980)). Courts should not engage in "hair-splitting analysis" in search of a possible defamatory meaning. *See Mullins v. Thieriot,* 19 Cal.App.3d 302, 304, 97 Cal. Rptr. 27 (1971). Even if this quote were found to be defamatory, plaintiff has presented no clear and convincing evidence that Malcolm entertained serious doubts about the truth of the statement. Masson admitted that this topic was discussed several times; he also admitted that he has, in the past, stated his belief that Denise worries too much.

### 7. "Sex, Women, Fun"

The article quotes Masson as saying that if he had moved into the Freud house, the house would have not only been "a place of scholarship, but it would also have been a place of sex, women, fun." In its August 19, 1986 Order, the Court found that this disputed passage was substantially true because the sting of the passage is the same as that of undisputed tape-recorded pas-

sages. Plaintiff now urges this Court to reconsider its ruling based upon newly-discovered evidence. Plaintiff claims that Malcolm represented to the *New Yorker* magazine attorneys that the phrase was on tape, when in fact it was not. Plaintiff further points out that the original manuscript contained the correct quote, but Malcolm crossed it out and substituted the disputed phrase.

This new evidence has no bearing on whether the phrase legally was substantially true. This Court, for the purposes of this motion, can assume that Masson did not use precisely those words. That assumption does not change the Court's prior conclusion that a fair-minded jury would have to conclude that the "sting" of the passage was substantially true and that its inclusion in the article could not have created a false impression affecting the overall "gist" of the article so as to render it false.

### 8. "The Greatest Analyst"

The final, and most problematic, disputed passage appears in the article as follows:

A few days after my return to New York, Masson, in a state of elation, telephoned me to say that Farrar, Straus & Giroux had taken *The Assault on Truth*. "Wait till it reaches the best-seller list, and watch how the analysts will crawl. They move whichever way the wind blows. They will want me back, they will say that Masson is a great scholar, a major analyst—after Freud, he's the greatest analyst who ever lived. Suddenly they'll be calling, begging, cajoling: 'Please take back what you've said about our profession; our patients are quitting.' They'll try a short smear campaign, then they'll try to buy me, and ultimately they'll have to shut up. Judgment will be passed by history. There is no possible refutation of this book. It's going to cause a revolution in psychoanalysis. Analysis stands or falls with me now."

Malcolm asserts that the source of the above-quoted passage was a conversation she had with Masson during his visit to New York. She claims she took notes of that conversation because her tape-recorder was broken, and later typed her notes. Plaintiff, of course, claims the conversation never took place at all. The alleged "sting" of the passage is that it portrays Masson as a grandiose egotist and full of braggadocio.

Ignoring the type-written notes, which plaintiff disputes, this Court notes that many similar egotistical statements appear in tape-recorded portions of the interviews. For example, Masson and Malcolm did have the following tape-recorded exchange:

MASSON: Yeah but I've become, *for better or for worse, analysis stands or falls with me now.*

MALCOLM: Well that's a very grandiose thing to say.

MASSON: Yeah, but it's got nothing to do with me. It's got to do with the things I discovered.

MALCOLM: Well, whatever, that's still a ... thing and, and I'm not there yet.

MASSON: Well, you'll see.

MALCOLM: I can't think in this global yet. Maybe I will—

MASSON: You will.

MALCOLM: —after I've talked to a few more—

MASSON: Maybe you won't until you've written the article and see the reaction but it will, analysis is either going to face this kind of stuff that I've found, which are historical documents, and change or they're going to deny them and they're going to become destroyed.

(Emphasis added).

Masson also stated:

I mean, just—You're going to hear it. Talk to enough analysts and get them right down to these concrete issues and you watch how different it is from my position. It's utterly the opposite and that's finally what I realized, that I hold a position that no other analyst holds, including, alas, Freud. At first I thought: Okay, it's me and Freud against the rest of the analytic world .... Not so, it's me. It's me alone.

Regarding his book, Masson commented: "I've got to soon sit down and, you know, work ten hours a day on my book because

it's everything, everything hangs on that book." He also boasted:

> [M]y feeling is if I don't have one [a publisher], fuck them. I'll let the book come out in Europe and they'll be sorry, you know, it'll create all this storm and a lot of attention, and then they'll come to me and say, "Well, we'll pay you this, that and the other," and then I can pick and choose.

Masson also told Malcolm that psychoanalysts hated him and were envious of him. He said that they felt he was a potential danger to psychoanalysis. "They sensed that. And they were right. This man could single-handedly bring down the whole business." Masson predicted a strong reaction to his book, stating:

> I don't really know what the analytic reaction will be when they actually see this stuff in cold print but I know that it's not going to be a minor one, I mean, they're going to get really upset and especially in the new version. . . . [I]t's just more, in a way uncompromising. It doesn't let you go.

On several occasions in the tape-recorded interviews Masson commented on the fact that his findings and discoveries could not be contradicted. He stated:

> [W]hen this book comes out . . . I really feel it spells the beginning of the end of psychoanalysis, and he's definitely going to blame me, as will every other analyst in the world for having done psychoanalysis an irreparable damage. But what they'll say beyond that is still a puzzle to me, how they're going to reinterpret the documents I've found so that it, on the contrary . . . enhances Freud's image is totally mysterious to me. Undoubtedly they will try that. But I don't think they're going to fool the whole public. . . . I think that this book really is, uh, it's the end for them.

On another occasion, Masson told Malcolm:

> [W]hat I'm showing in all my work is that Freud said so for reasons that are not honest, and that's why analysts are so upset by it. Because if I am right, and it's very hard to prove that I am not, then they've got to say, "My God, what the hell have I been doing all these years to my patients?"

Masson described his book as "historical stuff," and claimed that "sooner or later it's going to be recognized. I mean cause it's not my opinion."

In light of the many egotistical and boastful statements that Masson made in tape-recorded comments regarding his book and his position in the world of psychoanalysis, this Court finds that plaintiff has not demonstrated clear and convincing evidence from which a reasonable jury could conclude that Malcolm entertained serious doubts about the accuracy of the passage.

**B.** *Claims Against* The New Yorker *Magazine and the Publisher*

As discussed above, no clear and convincing evidence exists to support a finding that the writer of the article entertained serious doubts about the truth of any of the disputed passages. Plaintiff bases his claims against *The New Yorker* magazine upon a theory of vicarious liability. Obviously, given this Court's finding that Ms. Malcolm is not liable, her employer cannot be vicariously liable. Furthermore, there is no evidence that *The New Yorker* entertained actual malice. The editor-in-chief, the copy editor, and the fact checker relied on Malcolm's word that she had reported Masson accurately. Malcolm had been a writer for the magazine for twenty years, with no prior complaints registered against her for misquotation. Publishers do not have to investigate personally, "but may rely on the investigation and conclusions of reputable sources. 'Where the publication comes from a known reliable source and there is nothing in the circumstances to suggest inaccuracy, there is no duty to investigate.' " *Reader's Digest*, 37 Cal.3d at 259, 208 Cal.Rptr. 137, 690 P.2d 610 (quoting *Bindrim v. Mitchell*, 92 Cal. App.3d 61, 73, 155 Cal.Rptr. 29 (1979)).

These principles of law also operate to relieve defendant Knopf, the publisher of Malcolm's book, of liability. Plaintiff alleges that, prior to publication, the president of Knopf was aware that Masson was challenging the accuracy of the *New Yorker* article. While knowledge of complaints or the threat of a suit "might well give a

publisher pause ... it would not necessarily lead it to doubt the truthfulness of its article or its sources." *Reader's Digest,* 37 Cal.3d at 260, 208 Cal.Rptr. 137, 690 P.2d 610. Defendant Knopf was entitled to dismiss plaintiff's complaints as nonmeritorious based upon the word of a well-respected, reliable author.

## IV. CONCLUSION

As discussed above, each of the alleged defamatory statements is either nondefamatory, substantially true, or a rational interpretation of ambiguous conversations. No clear and convincing evidence exists that would justify a finding that the writer or the publishers entertained serious doubts about the truth of the disputed passages. Accordingly, judgment must be entered against plaintiff and in favor of all defendants on plaintiff's claims of defamation and invasion of privacy.[7]

IT IS SO ORDERED.

---

**7.** Plaintiff agrees that this Court must apply the same standard, requiring clear and convincing evidence that defendants entertained serious doubts about the truth of the article, to his claim for invasion of privacy. Therefore, that claim falls along with the defamation claims.