[No. B096804. Second Dist., Div. One. Jan. 30, 1996.]

HUFSTEDLER, KAUS & ETTINGER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ZANE B. MANN, Real Party in Interest.

56

## Counsel

Munger, Tolles & Olson, Bradley S. Phillips and Stuart N. Senator for Petitioner.

No appearance for Respondent.

Kipperman & Johns and Richard S. E. Johns for Real Party in Interest.

## Opinion

**VOGEL (Miriam A.), J.**—The issue in this malicious prosecution action is whether the extent of the defendant-attorney's knowledge at the time the underlying lawsuit was filed is *always* relevant to the determination of probable cause. For the reasons explained below, we hold that it is not.

### The Underlying Action

College Savings Bank offers its investors certificates of deposit designed for parents who want to prepay their children's college education (College-Sure Certificates of Deposit). In the Spring of 1991, the Bank embarked on an advertising campaign to publicize its CDs as superior to tax-exempt zero coupon bonds for saving for future college costs. One advertisement, headed "Zero Coupon Bonds: The Wrong Choice for College Savers," triggered this litigation.[1] Zane B. Mann, the publisher of and principal writer for the *California Municipal Bond Adviser* (a monthly financial newsletter which, as

---

[1] As pertinent, the advertisement stated: "**Just say 'No!' to Zeros** [¶] Parents should avoid the use of zero-coupon bonds, which pay a fixed amount at maturity, to fund the uncertain price of tomorrow's college education. [¶] A zero-coupon bond is a fixed-rate asset while the future cost of a college education is a variable-rate liability. Prudent money managers do not fund variable-rate liabilities with fixed-rate assets. . . . [¶] **There is a Better Way** [¶] Many individuals as well as college and university administrators have found a way to meet the rising cost of college with the *CollegeSure*[] Certificate of Deposit (CD). [¶] The CollegeSure

its name suggests, comments on municipal bonds available in California), saw the Bank's advertisement in Forbes Magazine, and requested and received the standard investment information packet.[2] On October 1, 1991, Mann wrote (and the *California Municipal Bond Adviser* published) an article which, stated mildly, was critical of CollegeSure CDs.[3]

On October 18, the Bank sent Mann a formal demand for a retraction, claiming the article contained "patently false and malicious" statements. Mann refused to print a retraction, and on February 19, 1992, the Bank (represented by Shirley M. Hufstedler and her firm, Hufstedler, Kaus & Ettinger)[4] sued Mann for libel. Mann's motion for summary judgment was denied, and the case was tried to a jury. Mann's motions for a nonsuit and for a directed verdict were denied, after which the jury returned a nine to three verdict in his favor. The Bank did not appeal.

### The Malicious Prosecution Action

In December 1994, Mann filed this malicious prosecution action against the Bank and Hufstedler. In August 1995, Hufstedler moved for summary judgment, contending that (as a matter of law) probable cause existed for the

---

CD is indexed to college costs so it pays a variable interest rate tied to the college inflation rate. [¶] Moreover, the CollegeSure CD: [¶] *Is the only savings product *guaranteed* to pay college costs no matter how high they climb - no other investment offers this peace of mind; [¶] *Allows you to prepay college costs today at a deep discount to tomorrow's prices; [¶] *Requires only a low initial investment of $1,000; and [¶] *It's FDIC-insured, so it's backed by the full faith and credit of the U.S. Government up to $100,000 per depositor. [¶] Call . . . or write today to get complete information about the CollegeSure Certificate of Deposit . . . the *guaranteed way to save for college*."

[2]Mann's *Bond Adviser,* a self-described "in-depth monetary, economic, investment analysis for the sophisticated tax-exempt bond investor," has about 500 subscribers.

[3]As relevant, the article said: "The ad, and brochures we subsequently received, were filled with *bogus statements* about 'guaranteed' yields, *blatant misrepresentations* about tax liability, complete with *misleading graphs* and charts using *distorted methodology*. [¶] If similar material were to be distributed by a licensed securities dealer or a mutual fund group, the SEC could be expected in their office the next day with a restraining order and a hefty fine. The New Jersey banking commissioner must be very tolerant. . . . [¶] Much space is given over to a *cockamamie chart* which purports to show what would have happened if you would have invested in . . . the CDs in 1958 as compared to T-bills, T-bonds or municipal bonds. . . . [¶] If that is how the bank's investment officer handles their bond portfolio, they better take the key to the vault away from him. . . . [¶] The Bond Adviser can't believe that any of our subscribers would seriously consider this variable rate CD. Once again, we remind everyone to read the prospectus or literature carefully. Investigate the too good to be true claims-maker. Anyone who guarantees too high a yield is guaranteeing too high a risk. *This is an investment for the intellectually impaired*." (Italics added.)

[4]Unless the context suggests otherwise, our references to "Hufstedler" are intended to include the firm as well as Hufstedler herself.

Bank's libel suit.[5] Mann opposed the motion, contending there were triable issues of fact about the extent of Hufstedler's knowledge at the time she filed the underlying action. The trial court agreed with Mann and refused to grant summary judgment.[6] Hufstedler then filed a petition for a writ of mandate, asking us to compel the trial court to grant summary judgment, and we issued an alternative writ.

## DISCUSSION

Hufstedler contends the nature and extent of the attorney's knowledge at the time the underlying action was filed is irrelevant where, as here, the actual facts establish that the underlying lawsuit was tenable. We agree.

## I.

In *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at page 868, our Supreme Court held that where "there is *no dispute as to the facts upon which an attorney acted in filing the prior action,* the question whether there was probable cause to institute the prior action is purely a legal question, *to be determined by the trial court on the basis of whether, as an objective matter, the prior action was legally tenable or not.* If the court determines that the prior action was not objectively tenable—and thus concludes that the action was brought without probable cause—evidence of the extent of an attorney's legal research may be relevant to the further question of whether the prior action was instituted with malice, *but if the court finds that the prior action was in fact tenable, probable cause is*

---

[5]The Bank joined in Hufstedler's motion for summary judgment, and also joined in the writ petition now before us, ignoring the fact that the standard of proof on a motion for summary judgment for the plaintiff in the underlying action may differ from the standard applied to the lawyer for the plaintiff in the underlying action. (*Leonardini* v. *Shell Oil Co.* (1989) 216 Cal.App.3d 547, 569, fn. 7 [264 Cal.Rptr. 883], cert. denied (1990) 498 U.S. 919 [112 L.Ed.2d 247, 111 S.Ct. 293].) Since the trial court denied Hufstedler's motion for summary judgment, it had no reason to consider whether, in this case, the Bank's position is the same as its former lawyer's position. For that reason, our decision is limited to Hufstedler only, obviously without prejudice to the Bank's position and its right to file its own motion for summary judgment.

[6]The trial court held: "The facts upon which an attorney acted in filing the prior action are relevant to the issue of whether there was probable cause for the filing of that action. *Sheldon Appel Co.* v. *Albert & Oliker* [(1989) 47 Cal.3d 863 (254 Cal.Rptr. 336, 765 P.2d 498)]. The facts upon which the attorney ACTED are not necessarily the same as the facts ALLEGED OR PROVED in that action. . . . [¶] The motion does not survive the second paragraph of the Supreme Court's decision in [*Sheldon Appel*]. This court can decide the issue of probable cause as a purely legal question only when 'there is no dispute as to the facts upon which an attorney acted in filing the prior action.' This court has no idea what facts HUFSTEDLER acted upon in filing the underlying libel suit because HUFSTEDLER does not disclose such information in [her] moving papers."

*established—and the malicious prosecution action fails—without regard to the adequacy or inadequacy of the attorney's legal research efforts."* (Italics added.)

Mann and the trial court, focusing on the first emphasized phrase ("no dispute as to the facts upon which an attorney acted in filing the prior action"), take the view that, until such time as we know "the facts upon which the attorney acted," we cannot know whether those facts are disputed and thus cannot reach the next step in the analytical process—that is, we cannot determine "whether, as an objective matter, the prior action was legally tenable or not." Hufstedler's view is more pragmatic, essentially one of, "no harm, no foul," and she claims the extent of her knowledge at the time the Bank's action against Mann was filed is wholly immaterial where, as here, subsequent events demonstrate that the underlying action, objectively viewed, was legally tenable at the time it was filed.

As we will explain, consideration of the actual holding of *Sheldon Appel* and of the reasons the Supreme Court adopted an objective standard persuade that the repeated references in the opinion to the attorney's knowledge were included because, in the factual context of that case, reference to the attorney's knowledge was the only way to determine whether the underlying action was objectively tenable when it was filed. Stated differently, we do not read *Sheldon Appel* to require that, in every case, the extent of the lawyer's knowledge at the time the underlying suit was filed is per se relevant to the determination of probable cause. To the contrary, we believe that where, as here, the record in the underlying action was fully developed, a court can and should decide the question of probable cause by reference to the undisputed facts contained in that record. And where, as here, undisputed evidence establishes an objectively reasonable basis for instituting the underlying action, a "dispute" about what the attorney knew or did not know at the time she filed the underlying action is irrelevant.

## II.

To begin with, the Supreme Court granted review in *Sheldon Appel* "to consider a number of issues relating to the proper determination of the probable cause element in a malicious prosecution action, including the question whether a plaintiff may establish an absence of probable cause by proving that its former adversary's attorney failed to perform adequate legal research before filing the prior action." (*Sheldon Appel Co. v. Albert & Oliker, supra*, 47 Cal.3d at pp. 867-868.) To that end, the court determined "that the most promising remedy for excessive litigation does not lie in an

expansion of malicious prosecution liability" (*id.* at p. 873) and thus found it was *not* "advisable to abandon or relax the traditional limitations on malicious prosecution recovery." (*Id.* at p. 874.) It was from that perspective that the court analyzed the specific questions presented in *Sheldon Appel*—and it is from this same perspective that we must consider the issue presented in the case now before us.

A.

■ First, the Supreme Court determined the issue of probable cause is one for the court, not a jury. (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 874-877.) Thus, where there are no disputed questions of fact relevant to the probable cause issue, the matter may be determined by summary judgment (or on appeal by de novo review). (*Id.* at pp. 884-886.)

B.

Second, the Supreme Court determined that, where (as was the case in *Sheldon Appel*) "the facts known by the attorney are not in dispute, the probable cause issue is properly determined by the trial court under an objective standard; *it does not include a determination whether the attorney subjectively believed that the prior claim was legally tenable.*" (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 881, italics added.) To avoid confusion, the court "strongly emphasize[d]" that it did not mean to "suggest that an attorney who institutes an action which he does not believe is legally tenable is free from the risk of liability for malicious prosecution. If the trial court concludes that the prior action was *not* objectively tenable, evidence that the defendant attorney did not subjectively believe that the action was tenable would clearly be relevant to the question of malice. Inasmuch as an attorney who does not have a good faith belief in the tenability of an action will normally assume that a court is likely to come to the same conclusion, the malicious prosecution tort will continue to deter attorneys from filing actions which they do not believe are legally tenable.

"Furthermore, the probable cause element, as so defined, imposes no improper or unjustified hardship on a malicious prosecution plaintiff. *If a court finds that the initial lawsuit was in fact objectively tenable, the court has determined that the fundamental interest which the malicious prosecution tort is designed to protect—'the interest in freedom from unjustifiable and unreasonable litigation' [citation]—has not been infringed by the initial action.* Under such circumstances, it is not unfair to bar a plaintiff's suit for

damages even if the plaintiff can show that its adversary's law firm did not realize how tenable the prior claim actually was, since the plaintiff could properly have been put to the very same burden of defending an identical claim if its adversary had simply consulted a different, more legally astute, attorney. This is a classic case of 'no harm, no foul.' " (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 881-882, some italics added.)

In reaching this conclusion, the Supreme Court discussed a number of malicious prosecution cases in which the attorney-defendants had been specifically charged with knowledge of the falsity of the claim asserted in the underlying action, e.g., *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878], *Franzen* v. *Shenk* (1923) 192 Cal. 572 [221 P. 932], and *Albertson* v. *Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405]. As the Supreme Court put it in *Sheldon Appel,* in each of those cases the "plaintiff's contention was that the prior action had been prosecuted 'with knowledge *of the falsity* of the claim . . . .' " (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 880, including fn. 8.) In our case, Mann does not contend Hufstedler knew the Bank's claim was false or untrue. To the contrary, it is undisputed that Mann in fact made and published the statements alleged by Hufstedler on behalf of the Bank to have been libelous and injurious to the Bank's business. (Civ. Code, § 45 [libel is a false and unprivileged publication by writing which exposes any person to hatred, contempt, ridicule or obloquy or which has a tendency to injure him in his occupation].) As is apparent from Mann's malicious prosecution complaint and his opposition to Hufstedler's summary judgment motion, his position vis-à-vis probable cause is that any reasonable attorney should have known Mann's statements were non-actionable opinion or that the Bank was a public figure (and could not prevail because it would be unable to prove that Mann acted with malice). For these reasons, Hufstedler's knowledge has nothing to do with the theory of Mann's case.[7]

---

[7]To the extent other courts have suggested the attorney's knowledge at the time of filing the underlying action is *always* an issue in a malicious prosecution action, we believe they have misread *Sheldon Appel.* (E.g., *Nicholson* v. *Lucas* (1994) 21 Cal.App.4th 1657, 1665-1666 [26 Cal.Rptr.2d 778] [dicta to that effect]; *Leonardini* v. *Shell Oil Co., supra,* 216 Cal.App.3d at p. 570.) In his answer to Hufstedler's petition, Mann cites numerous cases predating the Supreme Court's decision in *Sheldon Appel,* all of which he claims support his position that the attorney's knowledge at the time the underlying action was filed is always relevant. Aside from the fact that most of these cases are inconsistent with *Sheldon Appel,* they do not stand for the proposition cited. (E.g., *Grant* v. *Moore* (1866) 29 Cal. 644, 654-656 [the issue of knowledge is not addressed at all; the court simply held that the facts *in existence* at the time the underlying action was filed determine whether the action was tenable, not facts that might have thereafter occurred]; *Harkrader* v. *Moore* (1872) 44 Cal. 144, 149-150 [focusing on the subjective element rejected in *Sheldon Appel* by reference to what the malicious prosecution

Moreover, as Hufstedler contends, the "fundamental interest" protected by the malicious prosecution tort is " 'freedom from *unjustifiable* and *unreasonable* litigation." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 882.) For this reason, even under the subjective belief standard *rejected* in *Sheldon Appel* (the question used to be whether the attorney had an "honest belief" that his client's claim was tenable) (*Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675, 683 [120 Cal.Rptr. 291]), a jury verdict in the client's favor in the underlying case was "conclusive evidence of the existence of probable cause *even though subsequently reversed.*" (*Cowles* v. *Carter* (1981) 115 Cal.App.3d 350, 356 [171 Cal.Rptr. 269], italics added.) That rule was based on the notion that persons who initiate civil proceedings should not thereafter be subjected to malicious prosecution litigation unless it could be shown that they acted without probable cause—and that if probable cause had been determined by the trier of fact in the prior proceedings, it was not subject to reevaluation even when the jury's determination was reversed. (*Ibid.;* see also *Gause* v. *McClelland* (1951) 102 Cal.App.2d 762, 764 [228 P.2d 91]; *Black* v. *Knight* (1919) 44 Cal.App. 756, 770 [187 P. 89]; *Lucchesi* v. *Giannini & Uniack* (1984) 158 Cal.App.3d 777, 785-788 [205 Cal.Rptr. 62].)

The several references in *Sheldon Appel* to freedom from "unjustifiable" and "unreasonable" litigation suggest the continuing validity of the rule that a prior determination of "probable cause" cannot be second-guessed in a malicious prosecution action even where the judgment in the underlying action is reversed on appeal.[8] It follows necessarily that where, as here, the record in the underlying action is equally complete (albeit with a different ending), it constitutes all the evidence needed to determine whether the underlying action was objectively tenable when it was filed. Accordingly, where (as here) there are no disputed facts concerning the record in the

defendant "believed" at the time the underlying action was initiated]; *Ball* v. *Rawles* (1892) 93 Cal. 222, 234 [28 P. 937] [subjective belief]; *Richter* v. *Neilson* (1936) 11 Cal.App.2d 503, 515 [54 P.2d 54] [subjective belief]; *Hudson* v. *Zumwalt* (1944) 64 Cal.App.2d 866, 872 [149 P.2d 457] [subjective belief]; *Lerner* v. *Glickfeld* (1960) 187 Cal.App.2d 514, 525 [9 Cal.Rptr. 686] [subjective belief]; *Harbor Ins. Co.* v. *Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1037 [211 Cal.Rptr. 902] [holding that a cause of action for malicious prosecution *accrues* upon the initial prosecution of the underlying action].)

[8]In *Sheldon Appel,* a lis pendens was filed in the underlying case (an action for declaratory relief). When the lis pendens was expunged, that meant the declaratory relief action had "terminated in Sheldon Appel's favor." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 869.) Thus, the malicious prosecution defendant's knowledge at the time the underlying action was initiated was the only way to determine whether the prior action was objectively tenable when filed. (See also *Leonardini* v. *Shell Oil Co., supra,* 216 Cal.App.3d at pp. 563, 567-570; *Klein* v. *Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 71, 75-76 [259 Cal.Rptr. 149]; *Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 886.)

underlying action, the trial court may by summary judgment determine the probable cause issue, and the attorney's knowledge is entirely irrelevant.[9]

## C.

■ After holding that an attorney's "reasonable" research and "industrious" investigation are legally irrelevant to the determination of probable cause (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at pp. 882-883) and that expert testimony is not admissible on the question of probable cause (*id.* at p. 884), the Supreme Court concluded with the articulation of a standard for determining whether the underlying action was objectively tenable when filed.

The court expressly rejected the more stringent "prudent attorney" test (where the question is whether a prudent attorney, after such investigation of the facts and research of the law as circumstances reasonably warrant, would have considered the action to be tenable on the theory advanced), adopting instead the less stringent "reasonable attorney" formulation of *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179], the definition applied to court-imposed sanctions for frivolous appeals " 'to avoid a serious chilling effect on the assertion of litigants' rights. . . . Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . .' " (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 885, quoting *In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.) As the court put it, there is no "reason to afford litigants and their attorneys less protection from subsequent tort liability than [there] is to shield them from court-imposed sanctions within the initial action." (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 885.)

Modified to the malicious prosecution context, the standard is "whether any reasonable attorney would have thought the claim tenable" (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 886), a standard that is satisfied if the issues presented in the underlying action were arguably correct, even if it was extremely unlikely the client would win (*id.* at p. 885).

---

[9]Since there is no claim in this case that the Bank failed to disclose information to Hufstedler, we do not decide whether an attorney's knowledge at the time she filed the underlying action would be relevant under those circumstances. (E.g., *Lucero* v. *Stewart* (9th Cir. 1989) 892 F.2d 52, 54-55.)

## III.

The question before us, therefore, is whether, viewed objectively, there are undisputed facts establishing, as a matter of law, that any reasonable attorney would have thought the Bank's claim was tenable. We answer the question affirmatively.

We begin with the fact that Mann never seriously disputed the Bank's claim that his statements were defamatory. Moreover, he ultimately admitted that at least some of them were false, and that he knew they were false at the time of publication. As noted above, his position was (and is) that the statements reflected his opinions, and that opinions cannot form the basis of a libel action. In addition, he claimed the Bank was a "public figure" and that, since he acted without malice, his statements were privileged. The question, therefore, is whether Mann is so absolutely correct that no reasonable attorney would have thought otherwise. The answer is "no."

### A.

The distinction between a statement of fact and one of opinion is frequently difficult, as it is in this case. In characterizing a statement, we must look at it not as lawyers and judges but by placing ourselves in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction. In short, the measure is not the effect of the statement on a mind trained in the law, but the natural and probable effect upon the mind of the average reader. (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) Accordingly, ". . . what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].)

"For these reasons, California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion. First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. [Citations.] Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion. [Citation.] [¶] Next, the context in which the statement was made must be considered. Since '[a] word is not a crystal, transparent and unchanged, [but] is the skin of a living thought and may vary greatly in color and content according to the circumstances and the

time in which it is used[,]' the facts surrounding the publication must also be carefully considered. [Citation.]

"This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.] ' "[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense, [the statement is not actionable]. [Citations.]" ' " (*Baker* v. *Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at pp. 260-261, fn. omitted.)

 Hufstedler and the Bank unquestionably had a tenable basis to claim the average reader of Mann's publication would understand his statements about the Bank's advertisement for its CollegeSure CD's as assertions of fact. Mann did not begin (or conclude) his article with words such as, "In my opinion," or "In my view," or "It seems to me" or anything of the kind. To the contrary, he announced at the outset that "[t]he ad, and brochures . . . were filled with bogus statements about 'guaranteed' yields, blatant misrepresentations about tax liability, complete with misleading graphs and charts using distorted methodology." At the end, he gave the investment (not just the advertisement) the kiss of financial death by suggesting it was "an investment for the intellectually impaired." In our view, Mann's statements about "blatant misrepresentations" and "distorted methodology" are reasonably viewed as statements of fact, not opinion.

Our conclusion is supported by the fact that Mann's statements appeared in a publication purchased and read by investors interested in municipal bonds. While we suppose some of them may view all commentary in Mann's newsletter as expressions of Mann's opinions, others must certainly look to Mann's *California Municipal Bond Adviser* for hard information about investments—that is, for facts rather than mere opinion. By no means does the nature of the newsletter in which the statements appeared make this an open and shut case for either side.

We are obviously not alone in this view. Mann moved for summary judgment in the Bank's libel action, contending the statements were his

opinions and therefore not actionable. The trial court denied his motion, finding there were disputed facts about whether the statements were of fact or opinion. ■ Although the denial of a motion for summary judgment in the underlying action does not itself preclude a subsequent malicious prosecution claim (*Lucchesi* v. *Giannini & Uniack, supra,* 158 Cal.App.3d at p. 787), the denial certainly supports our conclusion that the Bank's action was objectively tenable. Stated otherwise, if the statements were so clearly expressions of opinion that any reasonable attorney would have so viewed them, Mann's motion for summary judgment would have been granted.

■ At the time of trial in the libel action, the court denied Mann's motion for nonsuit and denied his motion for a directed verdict, again demonstrating the arguable validity of the Bank's claims against Mann. Given the trial court's special role in ruling on dispositive motions in libel cases (the distinction between fact and opinion is a question for the court, not the jury) (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260), the court's denial of Mann's motions is tantamount to a judicial declaration that, at a minimum, the Bank's claims were objectively tenable.

## B.

Ultimately, the libel action was decided in Mann's favor because the trial court ruled that the Bank was a public figure and that, therefore, it had to prove Mann's defamatory statements were made with actual malice. (*Harte-Hanks Communications* v. *Connaughton* (1989) 491 U.S. 657, 666-668 [105 L.Ed.2d 562, 575-577, 109 S.Ct. 2678].)[10] ■ As with the issue of opinion versus fact, however, the "public figure" issue is not cut and dried. To begin with, a fairly high threshold of public activity is necessary to elevate a person to public figure status (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 745 [257 Cal.Rptr. 708, 771 P.2d 406]) and, as to those who are not pervasively involved in public affairs, they must have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" to be considered a "limited purpose" public figure. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997].)

A "particularized determination" is required to decide whether a person is a limited purpose public figure (*Bruno & Stillman, Inc.* v. *Globe Newspaper*

---

[10]The public figure issue arose because, at about the time the Bank embarked on its advertising campaign, it had become "involved" in a then existing debate in California concerning the use of tax-exempt zero coupon bonds to save for college expenses. This involvement consisted of the publication of a one-page article by the Bank's president in the July 1991 edition of *California Public Finance.* Mann's article was published a few months later, on October 1.

*Co.* (1st Cir. 1980) 633 F.2d 583, 589), a standard ensuring that reasonable minds may differ on this subject. Particularly since the Bank's advertisements themselves could not have been sufficient to transform the Bank into a public figure (*Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763, 770 [160 Cal.Rptr. 97, 603 P.2d 14] [a person in the business world advertising his wares does not necessarily become part of an existing public controversy]; *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646, 661 [165 Cal.Rptr. 347] [advertising is not thrusting oneself into the vortex of a controversy]), the conclusion is inescapable that a reasonable lawyer (most likely, many reasonable lawyers) would have concluded the Bank was *not* a public figure and thus would not have had to prove malice to prevail on its libel claim.

## C.

In any event, we believe a reasonable lawyer deciding whether to file the libel action could have concluded that, assuming the trial court found that the Bank was a limited public figure, the Bank could have proved that Mann acted with malice. The article itself supports this view (the references to a "cockamamie chart" and to the investment as one "for the intellectually impaired"). Moreover, Mann admitted at trial that he knew at the time of publication that at least one of his statements was false. Since knowledge of the falsity of his statements would support a conclusion that he acted with malice (*Herbert* v. *Lando* (1979) 441 U.S. 153, 160 [60 L.Ed.2d 115, 124, 99 S.Ct. 1635]), a reasonable lawyer would not have rejected the lawsuit simply because the public figure issue existed. Any doubt about this conclusion evaporates when we focus on the fact that, after the trial court concluded there was sufficient evidence of malice to go to the jury, three jurors agreed with the Bank that there was malice (the verdict in favor of Mann was nine to three).[11]

## D.

Applying the appropriate standard to the facts of this case, we conclude that the libel action filed by Hufstedler on behalf of the Bank, although not ultimately successful, was legally tenable. Accordingly, we conclude based on undisputed facts that the libel action was not instituted without probable cause, that Hufstedler's knowledge at the time she filed that action on behalf

---

[11]Presumably, the three jurors who sided with the Bank rejected Mann's testimony that his newsletter was intentionally replete with rhetorical hyperbole, vigorous epithet, and poetic license, all aimed at persuading and entertaining his subscribers. According to Mann's testimony, his comments were not malicious but merely irreverent, humorous and provocative, which he claimed was what his readers had come to expect.

of the Bank is irrelevant, and that the trial court should have granted Hufstedler's motion for summary judgment. Any other conclusion would be entirely inconsistent with the theoretical underpinnings of *Sheldon Appel*—the imposition of reasonable limitations on malicious prosecution actions to avoid a serious chilling effect on the assertion of litigants' rights, by permitting lawyers and their clients to present issues that are arguably correct, even if it is extremely unlikely that they will win. (*Sheldon Appel Co.* v. *Albert & Oliker, supra,* 47 Cal.3d at p. 885.)

## DISPOSITION

Let a peremptory writ of mandate issue, compelling the trial court (1) to vacate its order denying Hufstedler's motion for summary judgment, (2) to enter a new order granting that motion, and (3) to enter judgment in favor of Hufstedler. The Bank's request to join is denied.

Spencer, P. J., and Ortega, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 22, 1996. Kennard, J., and Brown, J., were of the opinion that the petition should be granted.